[Civ. No. 19116. Third Dist. Oct. 30, 1980.]

Estate of META S. BAUER, Deceased.
KENNETH CORY, as State Controller,
Petitioner and Appellant, v.
HAROLD H. BLUCHER, as Executor, etc.,
Objector and Respondent.

**COUNSEL**

Myron Siedorf, Robert G. Harvey, G. Louis Ambrose and Gordon K. Ohanesian for Petitioner and Appellant.

Clarence L. Bradford for Objector and Respondent.

OPINION

**PARAS, J.**—The issue presented on this appeal is whether the superior court erred in ruling that Robert H. Spaethling is the equitably adopted son of Meta S. Bauer, deceased, and therefore entitled as her legatee and devisee to Class A transferee status for inheritance tax purposes.

The facts are not in dispute. Robert was born out of wedlock in Weissenstadt, Germany, on July 30, 1927. He was raised in the home of his mother's parents. When he was of school age, his mother's sister Meta, the decedent herein, and her husband Dr. Paul Bauer, both residing in Sacramento, met the boy in 1937 on a trip to Germany. They discussed with his mother the possibility of adopting Robert, and she expressed no objections since she felt he would have better future prospects in America with the well-to-do Bauers than in Germany. However, no adoption proceedings were instituted.

In 1938, when Robert was 11 years old, he entered school in Wunsiedel, Germany. The Bauers paid his tuition and room and board. The direct care of the boy, however, was undertaken by the public guardian of Wunsiedel, with all expenses paid through his office. In 1939, Robert's Aunt Anna (another sister of his mother, but who resided with the Bauers in Sacramento) went to Germany to bring Robert to California. However, in September 1939 Germany was in a state of war and its borders were closed to all German citizens. Anna was unable to get Robert out of Germany and returned to California alone. Robert continued his schooling in Germany until the age of 16 when he was drafted into German military service.

After the war it took some time before Robert and his mother were able to resume contact with the Bauers. Robert returned from military service, graduated from secondary school, and entered a German university in 1949. As before, the Bauers sent money to Robert for educational expenses and other necessities. In 1952, when 25 years old, Robert emigrated to the United States at the Bauers' request. He arrived in Sacramento, and his recollection of the meeting with the Bauers was that he finally had a "real home" and the Bauers were his

"family." Adoption was not discussed, since it no longer seemed relevant due to Robert's age and war experiences.

Robert enrolled at the University of California in Berkeley and the Bauers continued to pay his expenses. There he met his wife-to-be and asked the Bauers' permission to marry her. Shortly after the marriage in 1953 Robert was drafted into the United States Army for two years. After serving this term he returned to Berkeley and received a doctoral degree, following which he obtained an academic appointment at Harvard University. Robert credited his diligence and success to the gratitude he felt toward the Bauers, and his mother voiced the opinion that "from 1938 until 1953 [the Bauers]...could not have done more for a son of their own."

In 1960 Dr. Bauer died. Robert testified (by affidavit) in the trial court that Meta then became his responsibility. Money was never discussed, as Meta had fairly substantial savings. Robert flew from the east coast to Sacramento as often as he could to visit the decedent, and "often" brought his wife and children along.

During 1976 and 1977 Meta made substantial gifts to Robert, his wife, and their children. On her gift tax return she listed Robert as her nephew and Robert's children as her grandnieces and grandnephew. The gift tax credit on the transfers (included in the report of the inheritance tax referee) reflects this designation and classification.

On May 11, 1977, Meta died testate. Her will gives the bulk of her estate to Robert, who is there designated as her nephew.

The inheritance tax referee filed a report showing Robert as Meta's nephew and a Class B transferee, Robert's children as grandnieces and grandnephew, also Class B transferees, and Robert's wife as a Class C transferee. The total tax in the report was $50,373.40. The executor objected to the report, claiming Robert and the children should be taxed as Class A transferees and Robert's wife as a Class B transferee, on the basis that Robert was Meta's equitably adopted son. The superior court so found and sustained the executor's objection. An order fixing inheritance tax was issued and filed, which reflected such finding and reduced the tax to $28,272.27. The State Controller appeals from this order and seeks to have Robert taxed as a Class B transferee.

We briefly review California's inheritance tax law. Persons inheriting property generally are required to pay an inheritance tax. (Rev. & Tax. Code, § 13401.)[1] The amount of such tax depends upon the relationship between the decedent and the transferee. (§§ 13307-13309, 13404-13406.) Three categories of transferee are defined. Section 13307, subdivision (a), defines a Class A transferee as "A transferee who is the...lineal issue of the decedent." A Class B transferee is one who "is the...descendant of a brother or sister of the decedent." (§ 13308, subd. (a).) All others are Class C transferees. (§ 13309.) In conjunction with the aforementioned sections, the code defines the relationship of adopted children to their adoptive parents for the purpose of determining their classification. Section 13310, subdivision (a), provides that "In determining the classification of a transferee of any class for the purposes of this part, children adopted *in conformity with the laws of this state* while under the age of 18 years are deemed to be natural children of their adoptive parents...." (Italics added.)

In *Estate of Reid* (1978) 80 Cal.App.3d 185 [145 Cal.Rptr. 451], this court held that individuals *equitably* adopted fall within the section 13310 language of "adopted in conformity with the laws of this state," even though statutory procedures for formal adoption were not followed. The Controller asserts on appeal that Robert was not equitably adopted, and that only an unwarranted extension of the equitable adoption doctrine would permit such a finding. We agree.

The doctrine of equitable adoption has been recognized in California regarding matters of inheritance since the early 1900's.[2] (See *Furman* v. *Craine, supra.*) In *Estate of Radovich* (1957) 48 Cal.2d 116 [308 P.2d 14], its application was extended to inheritance tax matters. We approach this case by comparing it factually to other representative cases dealing with the doctrine.

In *Radovich*, the trial court found, and the Supreme Court affirmed, that George Vukoye was the equitably adopted son of Jack Radovich. George's parents and Radovich orally agreed the latter would adopt

---

[1] All section references henceforth are to the Revenue and Taxation Code, unless otherwise specified.

[2] It appears the doctrine had its foundation in the concept of specific performance of a contract (see, e.g. *Furman* v. *Craine* (1912) 18 Cal.App. 41 [121 P. 1007]), although promissory estoppel has also been suggested as its basis. (See Comment, *Equitable Adoption: A Necessary Doctrine?* (1962) 35 So.Cal.L.Rev. 491, 496.)

George, George changed his surname to Radovich, Jack publicly acknowledged George as his son, and George conducted himself as Jack's natural son. Additional facts were that George lived with Jack for 19 years after the agreement was entered into, and during that period worked in Jack's store.

The facts here differ greatly. First, the Bauers never publicly held Robert out as their son; this is confirmed by the reference to Robert in Meta's will as her nephew and by her similar listing of Robert in gift tax returns. Second, Robert never lived with the Bauers for any extended time period, nor did he provide any work or services to them. Finally, Robert never changed his name to Bauer, but kept his natural name.

In *Estate of Rivolo* (1961) 194 Cal.App.2d 773 [15 Cal.Rptr. 268], in a question involving heirship rather than inheritance taxes, the trial court found (on a jury verdict) that Dorothy Rivolo was the equitably adopted daughter of Frank and Agnes Rivolo. The appellate court affirmed. Dorothy was the decedent's niece. The court found that the Rivolos had stated to witnesses that Dorothy was their legally adopted daughter, that letters of guardianship over her were obtained, and that they told Dorothy that she was their legally adopted daughter. Also, the court found that Dorothy was always referred to by them as their daughter, lived with them until her marriage and worked in their business during that period. Frank Rivolo referred to Dorothy's son as his grandson.

Here by contrast the Bauers never told Robert he was legally adopted and never took out letters of guardianship. They never held out Robert or referred to him as their son. There was no showing that Robert assumed any duties normally associated with a parent-child relationship, such as performing household chores or working in a family business. Finally, Robert only briefly lived in the Bauers' home and then not until he was an adult; and Meta never referred to Robert's children as grandchildren, but as her grandnieces and grandnephew.

Most recently in *Estate of Reid, supra* 80 Cal.App.3d 185, this court was faced with equitable adoption in an inheritance tax case. Brian Tivel entered into a written agreement with John and Lilya Reid in which the latter were to adopt Brian in return for his promise to perform all things required of him as their child. A formal adoption was never consummated, but the trial court found that an equitable adop-

tion had occurred. The ruling was upheld on appeal. Among the facts which led to this conclusion were that after the adoption agreement Lilya executed a new will which referred to Brian's adoption, Brian was identified in the will as a son, and Lilya at all times referred to Brian as her son while Brian referred to Lilya as his mother. Brian moved into an apartment in a building owned by the Reids and in which they resided; and 11 years later Brian accompanied the Reids on their relocation from Marin County to Red Bluff to help take care of John, and in so doing passed up a lucrative career opportunity in San Francisco. Finally, when both John and Lilya contracted serious illnesses Brian assumed sole responsibility for their constant daily care, including tubular feeding and control and operation of an oxygen tent.

Again, the facts here differ greatly. Inter alia, Robert never lived with the Bauers for any appreciable period of time, and no evidence was introduced to show that Robert assumed responsibility for Meta's care. As above noted, there is no evidence to show that Meta held out Robert as her son. In fact in his sworn declaration, Harold Blucher, the executor, states that the decedent said Robert "should have been her son." This statement clearly recognizes that in Meta's thinking Robert remained a nephew.

■ The cases cited above illustrate that equitable adoption requires some form of agreement to adopt, coupled with subsequent objective conduct indicating mutual recognition of an adoptive parent and child relationship to such an extent that in equity and good conscience an adoption should be deemed to have taken place. We view the doctrine as one inspired by the spirit of Civil Code section 3529's maxim, "That which ought to have been done is to be regarded as done, in favor of him to whom, and against him from whom, performance is due."

The rule has been stated thus: "Equitable adoption is not the same as legal adoption, and the status of one legally adopted is not given. The rule usually refers to a situation involving an oral contract to adopt a child, fully performed except that there was no statutory adoption, and in which the rule is applied for the benefit of the child in the determination of heirship upon the death of the person contracting to adopt. . . . [¶] The burden of proving an equitable adoption is on the party claiming it, and where the right claimed is founded on an oral contract for adoption, such party must prove such part performance as to take the agreement out of the statute of frauds. Where it is sought to establish an equitable adoption the evidence will be examined with

special strictness. The contract must be established by clear, cogent and convincing evidence...." (Fns. omitted; 2 C.J.S., Adoption of Persons, § 32, pp. 446-447.)

Elsewhere the doctrine is summarized as follows: "While there is some difference of opinion, most courts which have considered the effect of an agreement to adopt hold that an agreement clear and complete in its terms, entered into by parties capable of contracting, which has been fully and faithfully performed on the part of the child *so that relief is required as a matter of justice and equity*, will be enforced in equity to the extent of decreeing that the child occupy in equity the status of an adopted child,..." (Italics added; 2 Am.Jur.2d, Adoption, § 16, p. 872.)

Applying the foregoing, it is apparent the doctrine is inapplicable here. Apart from the agreement to adopt, which was frustrated by circumstances beyond the parties' control, there is virtually nothing present either to fit the equitable adoption formula as above enunciated or to arouse a feeling that equity should intervene to defeat normal taxation. The trial court here extended the doctrine far beyond its proper bounds. Indeed, there are fewer equities operating in Robert's favor than those existing in countless cases of purely foster children of many years as to whom adoption was never considered and who therefore undeniably cannot claim the doctrine's benefit.

The judgment (order fixing inheritance tax) is reversed with directions to the probate court to refix the inheritance tax, treating Robert and his children as Class B transferees and Robert's wife as a Class C transferee.

Regan, Acting P. J., and Evans, J., concurred.