[No. B055991. Second Dist., Div. Three. July 23, 1993.]

JEROME T. STEWART, Plaintiff and Respondent, v.
TRUCK INSURANCE EXCHANGE, Defendant and Appellant.

470

## COUNSEL

Rushfeldt, Shelley & Drake, Alan L. Rushfeldt, Horvitz & Levy, David S. Ettinger and Mary F. Dant for Defendant and Appellant.

Michael J. Piuze, Frank D. Polito and John Keiser for Plaintiff and Respondent.

## OPINION

**CROSKEY, Acting P. J.**—In this *"Royal Globe"* bad faith action, Truck Insurance Exchange (Truck), the defendant below, appeals from the order of the trial court (1) granting the motion of the plaintiff, Jerome T. Stewart (Stewart), for a new trial on the issue of punitive damages, which had previously been eliminated by an order of nonsuit, and (2) denying Truck's motion for a new trial as to the issue of its liability for compensatory damages.[1] While the record in this case demonstrates substantial evidence of Truck's bad faith conduct,[2] it does not support Stewart's claim for punitive damages, given the "clear and convincing" burden of proof which such a claim must satisfy. In addition, the trial court failed to comply with Code of

---

[1]The trial court did agree with Truck, however, that the jury had awarded excessive compensatory damages to Stewart; thus, the actual order of the trial court was for a conditional new trial on that issue. This ruling included the denial of Truck's request for a new trial on liability.

[2]Stewart brought this bad faith action against Truck under *Royal Globe Ins. Co. v. Superior Court* (1979) 23 Cal.3d 880, 885, 888 [153 Cal.Rptr. 842, 592 P.2d 329]. His claim is based upon a judgment in the underlying action brought against Truck's insured which was entered in 1986 and thus comes within the transition window of *Moradi-Shalal v. Fireman's Fund Ins. Companies* (1988) 46 Cal.3d 287, 313 [250 Cal.Rptr. 116, 758 P.2d 58], which overruled *Royal Globe*.

Civil Procedure section 657 when it granted a new trial on the punitive damage issue without setting forth, in writing, the reasons therefore. We therefore will reverse the trial court's order granting Stewart's motion for a new trial as to punitive damages but will otherwise affirm.

FACTUAL AND PROCEDURAL BACKGROUND

The following chronology of events, which necessarily form the factual basis of Stewart's bad faith claim, are not in substantial dispute.[3] However, as the principal issue before us relates to the substantiality of the evidence supporting a claim for punitive damages, we discuss that chronology in some detail.

In February 1984, Stewart, who was then 74 years of age, underwent hip surgery at Good Samaritan Hospital (Hospital). On February 26, he was given a shot of Demerol which was negligently administered by a nurse into his left arm, rather than in the buttocks. The shot caused considerable pain and when he awoke the next morning he could not use his left arm. He was diagnosed as having a radial nerve palsy which rendered his left arm mostly paralyzed. Stewart was discharged from the Hospital in this condition on March 17, 1984.

On March 2, 1984, a written report of this incident was prepared by Hospital personnel and submitted to the Hospital's attorney.[4] However, it was not until June 14, 1984 that the Hospital received a letter from an attorney representing Stewart which gave notice of an intent to bring suit for professional negligence.[5]

Hospital notified Truck, its liability insurer, on June 27, 1984.[6] Truck insists that this was the first notice that it ever received of the injury to Stewart's left arm. However, there was testimony from a former Truck

---

[3] That is not to say that Stewart does not argue that reasonable inferences may be drawn from the undisputed facts which are supportive of his claim for punitive damages. As we discuss in some detail, however, even drawing every reasonable inference in Stewart's favor, these facts simply will not support the conclusion that Truck was guilty of malice.

[4] This letter report was labeled and referred to during the trial as a "Report to Attorney."

[5] This letter constituted the 90-day notice required by Code of Civil Procedure section 364, subdivision (a), before an action for professional negligence may be brought against a health care provider.

[6] The Hospital's report to Truck included (1) a copy of an internal Hospital memorandum stating the injection should have been given in the buttocks rather than in the arm and that it would be at least two weeks before it could be determined whether the injury was permanent; (2) the "Report To Attorney" form (of March 2, 1984) describing the effect of the injection as "Radial Nerve Palsy, Complete"; and (3) excerpts of Stewart's hospital records containing a February 27, 1984, note that Stewart's condition was not expected to change for about three weeks.

claims representative that the so-called "Report To Attorney" form was often used to notify the insurer of potential claims and that they were ordinarily sent to the insurer within a few days of an incident. Thus, the jury was certainly entitled to infer that Truck had received notice of a possible claim from Stewart as early as the first or second week in March of 1984.

Within two weeks after receipt of the attorney's statutory notice letter, Truck's claims representative wrote to the attorney and asked for information regarding the injury to Stewart, together with names of treating physicians and copies of all relevant medical reports. Although most of this information could have been obtained directly from the Hospital, Truck claims it needed to determine what medical evaluation or treatment Stewart had received since his discharge on March 17, 1984, and from whom.[7] For reasons not disclosed by the record, Stewart's attorney did not respond to this request.

On July 24, 1984, this case became much more serious. On that date, Stewart fell in his bathroom and suffered severe spinal injuries. He was taken back to the Hospital where he underwent surgery. He remained there until October 12, 1984, when he was discharged as a partial quadriplegic. While he was still in the Hospital, Stewart filed the underlying action in which he alleged that the Hospital had negligently administered an injection to his left arm the previous February.

In October 1984, soon after the filing of the action, Truck's claims representative telephoned Stewart's attorney and requested information as to Stewart's claimed medical expenses. Again, however, the attorney did not respond. At this point, Truck retained an attorney to represent Hospital's interests. That attorney then answered the complaint and made a demand on Stewart for a statement of damages. (Code Civ. Proc., § 425.11.)[8]

By mid-November 1984, it appears that Truck's attorney had satisfied himself that the Hospital had been negligent when it administered the Demerol injection. Truck's investigator came to the same conclusion by the first week in December. The question was the nature of Stewart's claimed injuries. What was particularly uncertain was the question of whether Stewart's very serious spinal injury of July 24, 1984, could be connected to the Hospital's admitted negligence five months earlier. By January 1985, however, it was clear that Stewart intended to take the position that these events

---

[7]Understandably, Stewart makes much of this kind of arguably unnecessary activity by Truck and correctly notes that it permits a reasonable inference supporting the claim of Truck's bad faith.

[8]For reasons not disclosed by the record, Stewart did not respond to this request until April 10, 1985, a delay of approximately six months. Code of Civil Procedure section 425.11 requires that a statement of damages be served within 15 days of a request therefore.

were causally related.[9] What was as yet undetermined was the extent of the monetary damages which would be claimed.

This contention by Stewart obviously impacted the settlement potential of this case and significantly influenced the investigative activity which was required. That investigation initially consisted of obtaining and examining Stewart's medical and employment records and taking his deposition. Truck's counsel was unable to obtain these records voluntarily and had to subpoena them. By June 4, 1985, he had finally obtained the medical records although not the employment records (as Stewart's former employer no longer had the records in its possession).

The medical records included reports which gave conflicting evaluations of Stewart's pre-July 24 condition.[10] The medical records also suggested that Stewart's fall may have been caused by alcohol or dizziness. Stewart's son had informed one doctor that his father had "always been a two-fisted drinker" and a cardiologist, who had seen Stewart in April 1984, noted that Stewart complained of episodes of fainting and lightheadedness. The possibility of alcohol involvement became much more concrete after Truck's attorney obtained a copy of a report by the paramedics who had responded to Stewart's home on the date of his fall. The report stated that Stewart had been found lying laterally on the bathroom floor and was unable to get up; a strong odor of alcohol was noted and Stewart told them he had "8-10 strong drinks at a 'stag party.' "

Stewart's deposition was taken on May 31, 1985. At that time he testified that (1) his arm had not improved following the injection and prior to his fall, (2) he had two to three drinks the night he fell, (3) he believed he could have broken his fall with his left hand had it not been injured, (4) as a result

[9]On January 3, 1985, Truck's counsel advised the insurer, "There may be some allegation from [Stewart] that the reason he fell on July 24, 1984, and injured his back was because of his inability to brace himself because of his left radial nerve palsy. However, we have not been so informed by [Stewart's] attorney of any connection between the two injuries." This contention by Stewart was not long in coming. In interrogatory answers served on or about January 25, 1985, Stewart included, in a list of claimed damages, medical bills in the sum of $76,891.58 which would only be justified if they included those incurred during the hospital stay from July 24 through October 10, 1984.

[10]For example, a report by a neurosurgeon who had examined Stewart in December 1984 at the request of Stewart's attorney stated that a week before his July 24 fall, Stewart had gone golfing, held a club in his hands and had driven a ball about 150 yards. This report also stated that (1) Stewart's arm had improved prior to his fall, (2) the spinal cord injury resulting from his fall tended to mask the extent of his earlier radial nerve injury and (3) his current disability was due primarily to the spinal cord injury resulting from the fall. However, the reports of other doctors indicated that Stewart continued to have complete radial nerve palsy up until the time he fell on July 24, 1984. Based on his examination of all of these records, Truck's counsel advised the insurer that Stewart's arm had not improved prior to his fall.

of his fall his arms and legs were partially paralyzed and (5) he intended to assert a claim for lost earnings but he could not describe the extent thereof.

In early June 1985, Truck's attorney advised that estimating the extent of Stewart's damages was difficult as it was unclear as to whether the injury to his left arm in February of 1984 in fact contributed to his fall in July and the serious spinal injury which resulted therefrom. The attorney advised Truck that he thought Stewart's claim was worth a minimum of $25,000 assuming a jury found no connection between the Hospital's negligence and the subsequent fall. However, if such a connection was found then a jury could award as much as $250,000 to $350,000. Truck's attorney therefore recommended additional discovery regarding causation and damages, including (1) further information regarding Stewart's claim of "lost earnings," (2) inquiry into Stewart's drinking history and habits, (3) subpoenaing the paramedic's report and taking his deposition, (4) taking the deposition of the neighbor who had hosted the "stag party" where Stewart had admittedly consumed some alcohol, (5) further inquiry into Stewart's claimed out-of-pocket expenditures and (6) an independent medical examination of Stewart.

Based on this report, Truck increased its reserves on Stewart's claim from $50,000 to the policy limit of $190,000. Shortly thereafter, on July 16, 1985, Truck's attorney recommended that an offer of settlement be made based on Stewart's arm injury only and he sought authority to settle for $35,000 to $50,000. This authority was granted and the attorney was so advised on August 7, 1985. This settlement range was selected by the attorney because of the differing medical opinions as to whether the radial nerve injury would have been permanent had the subsequent fall not occurred and because Stewart had provided no information as to the separate medical costs for the arm injury alone. Thus, the amount of such damages had to be estimated.

However, in spite of this authority, Truck's attorney did not submit any offer to Stewart. He did attempt on several occasions to obtain a demand from Stewart's attorney but these efforts were not successful. On July 24, 1985, Truck's attorney had obtained a copy of the paramedic's report which caused him to become even more optimistic about the causation issue. This, together with the difficulty in evaluating Stewart's damages and his counsel's continued insistence that the fall was connected to the Hospital's negligent injection apparently caused Truck's attorney to refrain from submitting any offer. Indeed, he did not ultimately make any offer until the mandatory settlement conference later in the year.[11]

On November 21, 1985, the paramedic's deposition was taken and the contents of the report were confirmed. The paramedic also stated that

---

[11]These facts certainly provided *some* substantial evidence in support of Stewart's bad faith claim. Beyond doubt, Hospital's liability for Stewart's original injury was clear from the very

Stewart's speech had been slurred. Truck's attorney also interviewed guests who were at the party with Stewart on the night of July 23, 1984. They stated that Stewart's drinking was "normal, only a couple."[12]

On December 3, 1985, Stewart sent a statutory settlement demand (Code Civ. Proc., § 998) of $500,000. Truck's attorney recommended that it make a counteroffer of $40,000 which in his opinion was "a reasonable sum and [would] compensate Stewart for the damages to his left arm only."

On December 9, an independent medical examination was conducted by a Dr. Daniel Levine. His report concluded that Stewart's radial nerve had improved and that Stewart's existing injuries were primarily the result of his fall on July 24, 1984. The content of this report, in the opinion of Truck's attorney, gave further support to the lack of causation argument which the Hospital could raise at trial.[13]

On December 13, 1985, Truck's attorney submitted a settlement offer to Stewart in the sum of $20,000. The reasons for this amount, as set forth in the offer, were the testimony of the paramedic and the medical conclusions reached by Dr. Levine during his medical examination. This offer was clearly unacceptable to Stewart, particularly in view of the fact that he was incurring annual nursing expenses of $50,000. As a result, the mandatory settlement conference on December 23, 1985, was both short and unproductive.

The case went to trial on January 15, 1986. Just before jury selection, Truck increased its offer to settle to $50,000. Its attorney had advised Truck that there was a risk of a six-figure verdict but, given all of the evidence which he had developed on the causation issue, he believed there would, at least, be a substantial comparative negligence argument which could be asserted. This offer was rejected by Stewart, and his attorney advised Truck's counsel that further negotiations would not be productive unless Truck was willing to make an offer in the range of six figures. On January

---

beginning, yet no attempt was made to effectuate a settlement (beyond requesting that Stewart make an initial demand) until the mandatory settlement conference in December 1985.

[12]Truck's attorney later testified that he assumed that this discrepancy with what Stewart had told the paramedics was explained by either (1) the other guests' attempt to "soft-peddle" Stewart's drinking in order to help him out or (2) Stewart's consumption of additional drinks after he left the party. There were, of course, other possibilities. Stewart could have misspoke himself or the paramedics could have misunderstood.

[13]Dr. Levine explained that the muscles affected by the radial nerve were not atrophied to the degree one would expect if there was radial nerve injury to the extent claimed by Stewart; also, the right hand showed the same problems as the left. In addition, Dr. Levine reported that Stewart suffered from peripheral neuropathy, a nerve disease that can be caused by old age.

30, 1986, Stewart's counsel wrote to Truck's attorney and detailed what he described as the insurer's "history of efforts at delay."[14]

The jury returned its verdict in February 1986. It found that the Hospital had been negligent and that its negligence had been a legal cause of Stewart's damages which it set at $880,610.35.[15] However, it also found that Stewart was 75 percent responsible for his own injuries and the Hospital 25 percent.[16] Thus, Hospital was liable for only $220,152.59. Shortly thereafter, in April 1986, the case was settled for the total sum of $210,000[17] of which Truck paid all but $14,600 (the balance being paid by Hospital's excess insurer).

On January 20, 1987, Stewart filed this action against Truck in which he alleged that the insurer's handling of the claim against the Hospital violated Insurance Code section 790.03, subdivision (h)(3) and (5).[18] After some law and motion activity, the case went to trial on Stewart's second amended complaint on September 26, 1990.

---

[14]The letter from Stewart's counsel stated:

"1. You mailed your request for designation of experts to us on the last legal day, including two extra days allowed because of a weekend. [¶] 2. Your request for depositions of some of the experts was not made until approximately two weeks later. [¶] 3. When I said that there was then no longer time to depose all of the experts before trial, but agreed to cooperate with you on arranging for the depositions that were possible, you asked the law and motion department for a continuance of trial. [¶] 4. When the law and motion department denied your request for the continuance, you appeared on the morning of trial and asked the trial department for a continuance. That motion was also not granted. [¶] 5. You used the same delay as a basis to request the trial judge continue the trial, a request which was again denied. [¶] 6. The trial judge did permit you to have one-half day off during trial so that you could depose one of plaintiffs' experts. [¶] If there has been no effort to postpone payment to Mr. Stewart because of his age and infirmity, can you explain why the defendant offered only $20,000.00 before trial and, only when we were in the courtroom about to commence trial was that offer increased to $50,000.00? [¶] Finally, as you know, there are two plaintiffs in this case and it is not fair to make a combined offer to both."

[15]The $880,610.35 figure was broken down by the jury's special verdicts as follows: (1) $87,010.35 for past medical costs, (2) $427,600 for future medical costs, (3) $48,000 for past lost wages, (4) $68,000 for future lost wages, and (5) $250,000 for past and future emotional distress.

[16]In addition, the jury awarded Stewart's wife $35,000 on her loss of consortium complaint which had been separately filed, but had been consolidated prior to trial.

[17]The sum paid the claims of both Stewart and his wife.

[18]Insurance Code section 790.03, subdivision (h)(3) and (5), provide that it is an unfair method of competition and an unfair and deceptive act of practice in the business of insurance to: "(h) Knowingly [commit or perform] with such frequency as to indicate a general business practice any of the following unfair claims settlement practices: [¶] . . . [¶] (3) Failing to adopt and implement reasonable standards for the prompt investigation and processing of claims arising under insurance policies. [¶] . . . [¶] (5) Not attempting in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear."

In addition to the evidence of Truck's handling of Stewart's claim, conflicting opinions of Truck's alleged bad faith conduct were offered. Stewart produced an expert witness who expressed the opinion that Truck had violated the provisions of Insurance Code section 790.03, subdivision (h)(3) and (5), when (1) it failed to investigate the probable damages resulting from the radial nerve injury to Stewart's left arm and, (2) in spite of the fact that Hospital's liability became reasonably clear very early, it failed to make an earlier settlement offer. He also testified that the offer of $20,000, when it was finally made, was too low and clearly failed to take into account that Hospital might have at least some responsibility for Stewart's quadriplegia. This opinion was countered by Truck's expert who expressed directly contrary views.

Stewart also offered the testimony of one Robert Mars, who had been the claims representative originally assigned to Stewart's claim.[19] He testified that his previous supervisors at Truck had followed a practice of trying to settle the claims of elderly claimants quickly as they might die before their cases could come to trial. By contrast, he had been told by Joanne Core, the supervisor for whom he had worked while assigned to the Stewart claim, that such cases should be "worked up to the hilt."[20]

It was Stewart's contention at trial that this evidence not only demonstrated bad faith but also supported his claim for punitive damages. However, the trial court disagreed. The court concluded that whatever may have been said to Mars about how he should churn or delay his investigations of claims of the elderly, there was no evidence in this case that such a practice

---

[19]The record reflects that Mars was assigned to this matter until September 1984, when he resigned from Truck's employ. Just prior to his resignation, his supervisor (Branch Claims Manager Joanne Core) had threatened to place him on probation for not investigating claims.

[20]Mars also testified that he was instructed, in effect, to hold off on the investigation of claims of the elderly. Specifically, his testimony was as follows:

"A. Ms. Core expressed to me her feelings that these cases should be sort of worked up to the hilt.

"Q. Did she ever explain her reasons why?

"A. Well, yes.

"Q. What were those reasons?

"A. Well, we were aware and she discussed with me that it takes about three to five years to bring a case to trial from the date you come in and you get your case number stamped on your case until the date you get to come and stand in front of the jury and get your story because of the sheer backlog in the courts and all the drug cases that go on, that it would take three to five years, no matter what you did to try to speed it up, and when you have, as you did, most of the people who make claims against hospitals who are injured were by definition either very old or very sick, they would either pass away or become senile before they could fully utilize the legal system.

"Q. So were there discussions where she said, 'hold off on doing anything until they either passed away or became incompetent'?

"A. I don't believe it was put quite so bluntly, but, yes."

had been followed. After reviewing the evidence of Truck's actual conduct in this matter, the trial court, on October 16, 1990, granted a nonsuit on Stewart's punitive damage claim.[21] The court found that there simply was no evidence of any *conduct* by Truck, *in this case*, that was malicious, oppressive or fraudulent.[22]

On October 30, 1990, the jury returned its special verdict that Truck had violated Insurance Code section 790.03, subdivision (h)(3) and (5), and that such violations were a legal cause of injury to Stewart. The jury

[21]Stewart argued that Mars's testimony as to what he was told about how he should conduct investigations was sufficient evidence to enable the punitive damage issue to go to the jury. The trial court responded with the following explanation of its ruling:

"The Court: But, see the language [used] doesn't mean anything. There is no punitive damages for language. That is why I kept emphasizing in my voice the word 'conduct.' [¶] You can go out and use all kinds of nasty words and you can say all kinds of unpleasant and rotten things, but only conduct is actionable, and I don't see any evidence at all of any conduct here that was oppressive, malicious or fraudulent. [¶] . . . [¶] Let us face it, the question of clear and convincing goes to the extent that the jury is persuaded of the truth, but there has to be some evidence, competent evidence, on which they can be persuaded, and I don't think there is any here. [¶] . . . .

"The Court: The chronology is something we are all familiar with after these days of testimony: The injury in February; Mr. Stewart remained in the hospital until March. His attorney sent the 90-day letter in June. I mean, even if you took Mr. Hale's opinion that, well, they should have gone out and found Mr. Stewart, they should have made him an offer for his injured arm, even if that were true, it couldn't possibly have been despicable. I mean, that is ridiculous. So the demand letter goes out on June 14th, the demand letter goes to the hospital. Then it goes to the carrier on June 27th, and they have knowledge that Mr. Stewart has a lawyer. [¶] Well, it couldn't possibly be despicable conduct not to contact Mr. Stewart after that because they have a duty to deal with his lawyer and not to go throwing money at him. They have got to deal with his lawyer, so they write a response letter on the 12th of [July] asking for documentation of the claim. . . . [¶] The letter has been variously characterized. Mr. Kinkle thought it was a stall letter. Mr. Hall thought it was a worthless letter asking for information that they might have already had. I will accept that for the purposes of this argument. [¶] But is it malicious conduct to send out a letter asking for documentation? The evidence is also that that is a customary and usual thing to do. [¶] So then what is the next thing that happens after the July 12th letter? The next thing that happens is that Mr. Stewart falls in his bathroom on July 24, and immediately thereafter, Mr. Kinkle hooks up the injury of July 24 to the injection of February. [¶] Well, can it possibly be malicious or oppressive not to make him an offer then when he has just now made a claim for a catastrophic injury? No. No way. [¶] So then what happens? The next thing that occurs is that on September 14, 1984, the plaintiff files suit. So after the plaintiff files suit, they have to get a lawyer, they give it to Mr. Davis' office, and Davis takes it over after that. [¶] I don't see any evidence of any oppressive, malicious or despicable conduct here whatsoever, and after the case is in litigation and Mr. Davis is handling it, making the decisions with it, I don't see any evidence of any oppressive or malicious or fraudulent conduct. [¶] The case was processed, interrogatories, discovery, and what have you, settlement discussion, inadequate claim to the plaintiff. But a settlement offer was made and rejected and the case goes to trial. [¶] So the motion for nonsuit as to the punitive damages sought pursuant to Civil Code section 3294 is granted."

[22]The trial court subsequently denied Stewart's motion for reconsideration and Stewart's petition for a writ of mandate was denied by another division of this court.

awarded him $175,000 for his "financial injury" and $25,000 for emotional distress. Truck moved for a new trial on the issues of both liability and damages. The trial court disagreed as to the issue of liability but did agree that the *financial injury* damages awarded to Stewart were excessive in that the evidence did not reflect a loss of more than $62,000. Truck's motion was therefore partially and conditionally granted: unless Stewart accepted a remittitur of the amount of his judgment to $87,000 (i.e., $62,000 financial injury damages plus $25,000 for emotional distress), there would be a new trial as to damages. Although the trial court did not limit the conditional new trial to financial injury damages, the only explanation given for the order was the excessiveness of *those* damages.

Stewart also moved for a new trial with respect to the trial court's grant of a nonsuit on the issue of punitive damages. *Without explanation*, this motion was granted.[23]

Truck then noticed this timely appeal. Stewart moved in this court to dismiss the appeal on the ground that the trial court had, in effect, ruled that if Stewart was unwilling to accept the remittitur a new trial on all issues had been ordered. We denied that motion, concluding that the trial court had ordered a new trial only on the damages issue.[24] Stewart petitioned for rehearing and Supreme Court review. Both petitions were denied.

## ISSUES PRESENTED

Truck raises two principal issues. First, it asserts that there was no substantial evidence to support the jury's determination that it had violated Insurance Code section 790.03, subdivision (3) and (5). Therefore, it contends that it is entitled to entry of judgment in its favor on all issues.

Secondly, Truck argues that the trial court properly granted a nonsuit as to punitive damages and its order thereafter granting a new trial on that issue was error. Truck contends that there was no substantial evidence of conduct by Truck which would support a punitive damage claim.

---

[23]Although the court explained the basis for its ruling on Truck's new trial motion, it did not do so with respect to the one made by Stewart. The court simply included in its minute order the sentence, "[Stewart's] motion for new trial is granted." In its oral announcement of this decision the trial court does not provide much additional information: "I'm going to grant [Stewart's] motion. In other words, if the motion for new trial is granted because of [Stewart's] failure to file the remittitur, then his motion for a new trial on the issue of punitive damages is likewise granted. . . . [¶] In other words, you try the case, everything all over again."

[24]As the point was not raised or argued in Stewart's motion papers, we made no distinction between "financial injury" damages and those for emotional distress. However, on this record it is clear that the only damages which the trial court thought to be excessive, or to which its new trial order was directed, were the former.

Truck finally asserts that if we agree with *either* of these contentions then we need not consider or address any other issue. In such event, Truck withdraws all remaining contentions.[25] As we believe that the trial court improperly granted a new trial on the punitive damage claim, we accept Truck's reduction of the issues before us. We therefore will deal solely with that question and will conclude that the trial court was in error for two reasons, the first substantive and the second procedural: (1) there was no substantial evidence to support a punitive damage claim and (2) the trial court failed to explain its reasons for granting a new trial on the issue as required by Code of Civil Procedure section 657.

## DISCUSSION

### 1. *Standard of Review*

In reviewing the trial court's order granting Stewart a new trial on the punitive damage claim, we necessarily review the correctness of the court's original order granting Truck a nonsuit on that issue. If the trial court correctly granted the nonsuit motion, then there was no error of law on which to base the grant of a new trial.

■ The standard by which we review an order granting a motion for a nonsuit is well and long settled. Truck's motion was properly granted *only* if it appeared from the evidence, viewed in the light most favorable to Stewart, that there was no substantial evidence supporting a punitive damage claim. If there was some credible evidence, even though in conflict with other credible evidence, that is sufficient; similarly, it is enough if reasonable inferences may be drawn from the evidence presented which will satisfy the requirements of a claim for punitive damages. In making this evaluation of the evidence the trial court may not weigh the evidence or judge the credibility of witnesses. (*Carson* v. *Facilities Development Co.* (1984) 36 Cal.3d 830, 838-839 [206 Cal.Rptr. 136, 686 P.2d 656]; *Ashcraft* v. *King* (1991) 228 Cal.App.3d 604, 611 [278 Cal.Rptr. 900].)

### 2. *A Claim for Punitive Damages Must Be Evaluated in Light of the Applicable Evidentiary Standard*

■ Since January 1, 1988, a claim for punitive damages has required evidence which establishes by *"clear and convincing evidence"* that the

---

[25]At oral argument Truck insisted that this concession should not be construed as an abandonment of its argument that there was no substantial evidence of its *liability* for bad faith and thus it is entitled to entry of judgment. We do not mistake the point; however, we believe that this record certainly provides substantial evidence of Truck's liability on that claim and thus this alternative contention is without merit.

defendant has been "guilty of oppression, fraud, or malice." If a plaintiff is to recover on such a claim, it will be necessary that the evidence presented meet this higher evidentiary standard. As the United States Supreme Court put it, in the context of ruling on a motion for summary judgment, "the judge must view the evidence presented through the prism of the substantive [clear and convincing] evidentiary burden . . . . [¶] Our holding that the clear-and-convincing standard of proof should be taken into account in ruling on summary judgment motions does not denigrate the role of the jury." (*Anderson* v. *Liberty Lobby, Inc.* (1986) 477 U.S. 242, 254-255 [91 L.Ed.2d 202, 215-216, 106 S.Ct. 2505]; see also *Reader's Digest Assn.* v. *Superior Court* (1984) 37 Cal.3d 244, 252 [208 Cal.Rptr. 137, 690 P.2d 610]; *Live Oak Publishing Co.* v. *Cohagan* (1991) 234 Cal.App.3d 1277, 1288 [286 Cal.Rptr. 198].)

We see no reason why this standard should not apply here. If Stewart was ever going to prevail on his punitive damage claim he could only do so by the presentation of clear and convincing evidence that Truck had by its conduct, demonstrated malice.[26] Thus, the trial court properly viewed the evidence presented by Stewart with that higher burden in mind.[27] In our review of the trial court's order granting the nonsuit, we can do no differently.

### 3.   *Stewart Did Not Present Any Substantial Evidence of Malice*

■   As already noted, Stewart claimed only that Truck was guilty of malice. However, the evidence presented, while sufficient to support a verdict based on bad faith, provided no basis whatever for the conclusion that Truck had acted with malice.[28]

Stewart's attorney himself underscores this conclusion by his own argument summarizing what he perceived to be the strong points of the case offered in support of the punitive damage claim. In opposing Truck's motion for a nonsuit on this issue he argued only that, "the conduct [demonstrating malice] is then taking his time on this claim, and it's supported by the way the claim was handled and the fact there was never an investigation done

---

[26]The only basis asserted by Stewart in the trial court for imposing punitive damages on Truck was malice. He does not contend otherwise here.

[27]Beyond doubt, when the Legislature amended Civil Code section 3294 in 1987 to impose a "clear and convincing" evidentiary standard, it intended to impose a new statutory limitation on the award of punitive damages. (*Mock* v. *Michigan Millers Mutual Ins. Co.* (1992) 4 Cal.App.4th 306, 331 [5 Cal.Rptr.2d 594].)

[28]Civil Code section 3294, subdivision (c)(1) defines malice as "conduct which is [1] *intended* by the defendant to cause injury to the plaintiff or [2] *despicable conduct* which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." (Italics added.)

until [the new adjustor] got on the phone, and then even after that, that some of the delay that is not explained, especially in [the claims supervisor's] testimony, that within, I believe it was 30 to 60 days, an investigation report should be done, and within 30 to 60 days the hospital should be contacted, this is way beyond that. And [it] explains Mr. Mars' conduct in accordance with the way he was instructed."

While we have no trouble concluding that the evidence in this case was sufficient to support the jury's finding of bad faith, it does not follow that it also established a basis for punitive damages. ■ As we recently noted, "Evidence that an insurer has violated its duty of good faith and fair dealing does not thereby establish that it has acted with the requisite malice . . . to justify an award of punitive damages. [Citations.] In order to establish that an insurer's conduct has gone sufficiently beyond mere bad faith to warrant a punitive award, it must be shown by *clear and convincing evidence* that the insurer has acted maliciously . . . ." (*Mock* v. *Michigan Millers Mutual Ins. Co.*, *supra*, 4 Cal.App.4th at p. 328, italics in original.)

■ Did Truck's conduct, viewed in the light most favorable to Stewart, rise to the level of malice? Was there any evidence that Truck *intended* to cause Stewart injury? Did Truck's actions constitute despicable conduct[29] carried out in a conscious disregard of Stewart's rights? We think, as the trial judge obviously did,[30] that the answer to each of these questions is no. While Truck's investigation could possibly have been pursued with more vigor, it was nonetheless pursued, not ignored. By the time that Stewart's "intent to sue" letter had been received by Truck there were only four or five weeks before Stewart's fall seriously complicated not only his recovery from the consequences of the negligent injection but also the investigation and evaluation of this case.

There simply was no evidence of either an intent to injure Stewart or any despicable conduct carried out in conscious disregard of his rights. To the contrary, the record reflects an ongoing effort by Truck to obtain the necessary information to evaluate Stewart's damages which was only made more difficult by his unfortunate fall on July 24, 1984. The conclusion reached by Truck's attorney that the fall was unrelated to the earlier negligent injection and that most of Stewart's damages appeared to have resulted from his fall was not an obviously unreasonable one. We will not quarrel

[29]"Despicable conduct" is defined in BAJI No. 14.72.1 (1992) Re-rev.) as "conduct which is so vile, base, contemptible, miserable, wretched or loathsome that it would be looked down upon and despised by ordinary decent people."

[30]See footnote 21, *ante*, for the remarks of the trial judge summarizing the evidence when he granted Truck's nonsuit motion.

with the jury's conclusion that it violated Insurance Code section 790.03, subdivision (h)(3) and (5), but we certainly cannot agree with Stewart's claim that such acts provide any evidence of malice. In this regard, we also note that the record is undisputed that Truck relied entirely on the advice of its counsel from and after October 1984 when it was served with Stewart's complaint in the underlying action.

### 4. The Order for a New Trial as to Punitive Damages Did Not Comply With the Requirements of Code of Civil Procedure Section 657

Code of Civil Procedure section 657, as it was amended in 1965 and 1967, provides, "When a new trial is granted, on all or part of the issues, the court shall specify the ground or grounds upon which it is granted and the court's *reason or reasons* for granting the new trial *upon each ground stated.*" (Italics added.) Such specification must be put in writing and the statute prohibits the court from delegating this task to counsel. ■ This statutory change was designed to serve the dual purposes of (1) promoting some deliberation on the part of the trial court in the exercise of its broad discretionary power to grant a new trial and (2) making the right of appeal more meaningful by focusing the reviewing court's attention on the portion of the record which justifies the new trial order. (*Mercer v. Perez* (1968) 68 Cal.2d 104, 112-113, 115 [65 Cal.Rptr. 315, 436 P.2d 315].)

Appellate review of such an order is also limited by the statute. Where the only ground for granting the new trial motion was excessive damages, it "shall not be affirmed . . . unless such ground is stated in the order granting the motion and . . . it shall be conclusively presumed that said order as to such ground was made *only* for the reasons specified. . . ." (Code Civ. Proc., § 657, italics added.) ■ Here the *only* reason given by the trial court for conditionally granting Truck's new trial motion was the excessive nature of Stewart's "financial injury" damages. Thus, it is conclusively presumed that such ground is the *only* basis for a new trial on damages. The retrial of the damage issue must therefore, be limited to that issue.

With respect to Stewart's motion for a new trial, the trial court assigned no ground therefor and gave no reasons whatever. This is contrary to the mandate of the statute which requires that the trial court state the grounds and supporting reasons *in writing*, either in the order itself or in a separate statement filed within 10 days. (Code Civ. Proc., § 657; *La Manna v. Stewart* (1975) 13 Cal.3d 413, 422 [118 Cal.Rptr. 761, 530 P.2d 1073].) Oral statements by the judge are not sufficient. (*Steinhart v. South Coast Area Transit* (1986) 183 Cal.App.3d 770, 773, 774 [228 Cal.Rptr. 283].) Substantial compliance by the trial court is likewise not sufficient; "*full and timely*

*compliance*" with the statute is required. (*LaManna* v. *Stewart, supra,* 13 Cal.3d 413 at p. 423, quoting from *Mercer* v. *Perez, supra,* 68 Cal.2d at p. 124, italics added by the *La Manna* court.)

It is clear that the trial court did not comply with the statute and therefore the new trial order as to punitive damages cannot stand. We reject Stewart's argument that no separate reasons were required because the court had properly granted a conditional new trial as to financial injury damages. Those were separate motions made by separate parties. That it may have been the trial court's intent to ensure that if there was to be a new trial as to *any* damages there would be one as to *all* damages makes no difference. Compliance with the strict requirements of Code of Civil Procedure section 657 was not excused.

Moreover, this is not a case where it would be prejudicial or unjust to either party to have a limited retrial. (See, e.g., *Liodas* v. *Sahadi* (1977) 19 Cal.3d 278, 286 [137 Cal.Rptr. 635, 562 P.2d 316].) We do not have before us a verdict where an award of punitive damages is so interwoven with a compensatory award as to make it unfair to have a retrial limited to the latter. (Cf. *Pelletier* v. *Eisenberg* (1986) 177 Cal.App.3d 558, 563-566 [223 Cal.Rptr. 84].) The jury never received or considered the issue of punitive damages. Its decision as to the amount of compensatory damages was thus not affected or impacted by that issue. In addition, there is no logical connection between the presence or absence of malice and the amount of compensatory damages which Stewart is entitled to recover. There is no apparent rationale for reviving the punitive damage issue merely because there is to be a new trial as to a portion of the compensatory damages.

## CONCLUSION

During the trial, the trial court properly viewed Stewart's evidence through the prism of the substantive burden of "clear and convincing" evidence. When the evidence of Truck's alleged "malice" is so examined it is obvious that there is no issue to be submitted to a jury. There simply was no evidence of malice presented. The trial court's original order of nonsuit was correct. For that reason, and because it was procedurally defective, the order granting a new trial on that issue must be reversed. However, the conditional new trial order, limited to the issue of Stewart's financial injury damages, was proper.

## DISPOSITION

The portion of the trial court's order granting a new trial as to punitive damages is reversed. The portion of the order denying a new trial as to

Truck's bad faith liability but granting one as to Stewart's financial injury damages is affirmed. The case is remanded for further proceedings consistent with the views expressed herein. The parties shall bear their own costs on appeal.

Hinz, J., and Kitching, J., concurred.

A petition for a rehearing was denied August 23, 1993.