[No. G008482. Fourth Dist., Div. Three. July 30, 1991.]

In re the Marriage of WILLIAM ARTHUR and PHYLLIS JOAN CZAPAR.
WILLIAM ARTHUR CZAPAR, Appellant, v.
PHYLLIS JOAN CZAPAR, Appellant.

1310

COUNSEL

A. Lee Adair for Appellant Husband.

E. Robert Lemkin and Kevin G. Musulas for Appellant Wife.

OPINION

WALLIN, J.—William and Phyllis Czapar each appeal from the judgment in this marital dissolution. Phyllis contends the trial court erred in deducting the value of a future covenant not to compete from the value of the family business awarded to William. William contends the trial court erred in reclassifying certain amounts paid to Phyllis during separation as spousal support, finding he had wasted community assets by his mismanagement of the family business during separation and awarding Phyllis attorneys' fees.[1] We conclude the future covenant not to compete was improperly considered and remand for further proceedings. In all other respects the judgment is affirmed.

William filed a petition for marital dissolution in September 1984 to end his 22-year marriage to Phyllis. A major asset of the parties was a business called Anaheim Custom Extruders, Inc. (ACE), a plastic extruding company, which was started by them in 1977. William and Phyllis agree the business is community property.

The parties separated in January 1983. Before separation, William managed, and Phyllis had been employed by, ACE. After separation, William continued to manage ACE. Phyllis also continued to work for ACE until she was fired by William in December 1984. The trial court, after rejecting both parties' testimony regarding the value of ACE, ordered ACE sold in June 1987. However, on Phyllis's motion the court subsequently appointed its own expert to value ACE in April 1988. In July and August 1988, the court held a trial on the value of ACE and other reserved issues. The final judgment was entered on May 9, 1989.

The trial court awarded ACE to William and ruled it had a cash value to the community of $494,058. ACE's actual market value was $644,058, but the court concluded that should William sell ACE he would be required to

---

[1] Prior to oral argument, William dismissed his first point on appeal regarding division of community property patent rights as moot. This also renders moot his final argument in his brief regarding the trial court's refusal to reopen the case to allow him to present further evidence on the character of those patent rights.

give a covenant not to compete which diminished the value of the asset to the community. The court valued a covenant not to compete at $150,000 based upon William's prospective loss of earnings and reduced the value of ACE accordingly.

I

Phyllis contends the trial court erred in reducing the community property value of ACE by the value of a covenant not to compete because the existence of such a covenant is entirely speculative and, in any event, it is community property. The trial court appointed Silvan Swartz as its expert. His report is not part of the record on appeal. He testified that ACE had a market value of $637,518 and that a two-year covenant not to compete, which he valued at $50,000, would be required of William if the business was sold.

In its memorandum opinion the court concluded ACE had a value *to the community* of $494,058, that a four-year covenant not to compete was more reasonable, and that if William were to refrain from competition with ACE for four years, it would impact him financially in the amount of $150,000. Similarly, in its statement of decision, the court found ACE had a cash value of $644,058 which it reduced by $150,000, the financial impact on William of a four-year covenant not to compete.

Other than testimony regarding William's salary and what he could expect to earn in other jobs, the only information supporting the $150,000 figure is an ex parte letter written to the court by a prospective purchaser before the court appointed Swartz as its own expert to value ACE. The letter outlined a prior offer for ACE of $420,000, plus $50,000 per year to be paid to William for a three-year noncompetition agreement and a new offer of $610,000, less any "non-compete funds." However, this letter was not introduced into evidence.

The character of the proceeds of a covenant not to compete, given by a managing spouse as part of the sale of a community business, is an issue of first impression in California. Similarly, our courts have never addressed the question of whether the hypothetical value of such a covenant, given to effectuate a sale, may be considered in valuing the community property interest in the business.[2]

---

[2]*In re Marriage of Lotz* (1981) 120 Cal.App.3d 379 [174 Cal.Rptr. 618] raised these issues but is not dispositive. There, the court valued the goodwill of a community business at $319,000 and specifically found that a covenant not to compete would be required of the husband, to whom it was awarded, if he sold it. The husband challenged the court's valuation,

Other community property jurisdictions have addressed both issues. ▉ Our sister state cases, when viewed in conjunction with our own decisions valuing community assets, compel the conclusion that the consideration paid for a noncompetition agreement, or the value of that agreement, is the separate property of the covenanting spouse if such a covenant actually has been negotiated as part of the sale of the property. (*Carr* v. *Carr* (1985) 108 Idaho 684 [701 P.2d 304]; *Dillion* v. *Anderson* (Tex.Civ.App. 1962) 358 S.W.2d 694; *Lucas* v. *Lucas* (1980) 95 N.M. 283 [621 P.2d 500].) However, it is inappropriate when awarding the property to one spouse to reduce the value of the business by the speculative value of a hypothetical noncompetition agreement. (*Mitchell* v. *Mitchell* (1986) 104 N.M. 205 [719 P.2d 432]; *McGehee* v. *McGehee* (La.Ct.App. 1989) 543 So.2d 1126.)

In *Lucas* v. *Lucas, supra*, 621 P.2d 500, the husband and wife owned the stock of a funeral home which the husband operated. To divide the community property upon divorce, the husband sold the stock of the funeral home. As part of the stock sale, the husband entered into an agreement not to compete for 10 years for which he was to receive $10,000 per year as compensation. The court rejected the argument that the payments were additional compensation for the goodwill of the business. The stock had been sold for more than the value of the corporation's assets. The court stated that excess was the amount attributable to goodwill. The separate compensation for the covenant not to compete was the husband's separate property. (*Id.* at p. 502. See also *Carr* v. *Carr, supra*, 701 P.2d at p. 310; *Dillion* v. *Anderson, supra*, 358 S.W.2d at p. 696.)

*Mitchell* v. *Mitchell, supra*, 719 P.2d 432, is most analogous to the present case. There the trial court characterized the husband's accounting practice as community property and it was awarded to the husband. The value of the goodwill was listed at $153,968. The husband argued that the goodwill of his practice should have been characterized as a covenant not to compete and therefore, under *Lucas* should be his separate property. The appellate court affirmed, noting that goodwill is the value of the business in excess of its hard assets, and went on to state that unlike the goodwill of a business, a covenant not to compete cannot be valued until the business is sold. "A covenant not to compete should be viewed as an asset which is part of the value of a business *only when such a covenant is negotiated and received* by

---

contending it impermissibly took into consideration his postmarital efforts, i.e., his future noncompetition. While reversing on other grounds, the appellate court stated simply that there was no error in this finding because the court was not requiring the husband not compete, but "simply evaluating the . . . goodwill by taking into account the commercial reality that such a covenant is normally included in the sale [of such a] business." (*Id.* at p. 383.) There is nothing in the opinion to suggest the court either increased or decreased the community value of the asset as a result of this finding.

the business. [Citation.] When a buyer insists on a noncompetition agreement, he or she is seeking to preserve the goodwill. [Citations.] In cases such as this one, a hypothetical covenant not to compete should not be valued on divorce but should be viewed as a possible means to protect the value of the business' goodwill." (*Id.* at pp. 438-439, italics added. See also *McGehee* v. *McGehee, supra*, 543 So.2d at p. 1128.) In other words, the covenant not to compete is simply a means for protecting the value of the business goodwill. Until such a covenant has actually been negotiated, in light of the needs of the buyer and the seller, it is too speculative.

The *Lucas* and *Mitchell* cases are persuasive in view of our state's decisions rejecting speculative factors when valuing community assets. ▪ For example, it is improper to take into consideration the tax consequences of an order dividing a community asset unless the tax liability is immediate and specific and will arise in connection with the division of the community property. (See *In re Marriage of Fonstein* (1976) 17 Cal.3d 738, 749, fn. 5 [131 Cal.Rptr. 873, 552 P.2d 1169]; *In re Marriage of Davies* (1983) 143 Cal.App.3d 851, 857 [192 Cal.Rptr. 212]; *In re Marriage of Sharp* (1983) 143 Cal.App.3d 714, 718 [192 Cal.Rptr. 97]; *In re Marriage of Slater* (1979) 100 Cal.App.3d 241, 249 [160 Cal.Rptr. 686].) The courts have also held that the value of a community asset, such as a family home, should not be reduced by the costs of sale of the asset when the court has awarded the home to one party and there is no evidence that party intends to or is required to sell the home. (*In re Marriage of Stratton* (1975) 46 Cal.App.3d 173 [119 Cal.Rptr. 924]; but see *In re Marriage of Denney* (1981) 115 Cal.App.3d 543, 552 [171 Cal.Rptr. 440].)

▪ Here the trial court awarded the business to William. There was no evidence that a sale was required in order to meet his payment obligations to Phyllis. Neither was there evidence that a sale of ACE would occur at any time in the future. The court reasonably concluded that, as a commercial reality, a future buyer would probably require William to give a covenant not to compete. However, any number of scenarios could occur in which a sale or transfer of the business would not require such a covenant or in which the covenant would not have the value which the court placed on it. The court based the value of the covenant on what William could expect to earn for the four years following a sale, a total of $150,000. If William sold the business because he was retiring or had somehow become incapacitated, certainly the covenant would not have the same value. (See *In re Marriage of Rives* (1982) 130 Cal.App.3d 138, 151 [181 Cal.Rptr. 572].)

Establishing a value for a future covenant not to compete, separate from the value of the business goodwill itself, is entirely too speculative.

■ "[O]nce having made [an] equal division [of community property], the court is not required to speculate about what either or both of the spouses may possibly do with his or her equal share and therefore to engraft on the division further adjustments reflecting situations based on theory rather than fact." (*In re Marriage of Fonstein, supra,* 17 Cal.3d at p. 749.) If ACE is ever sold it will be William's decision affecting his separate property. The true value of a possible covenant not to compete can only be determined with reference to his circumstances at that time. Reducing the community value of ACE by the covenant's speculative value was error.

II

In response to an order to show cause for the payment of spousal support the parties stipulated on July 12, 1985, that Phyllis would be paid $2,000 per month from ACE. The payments were classified by William and Phyllis as a distribution of community property "subject to being re-classified at the time of trial—in the trial judges [*sic*] discretion . . . ." The trial court reclassified the payments as spousal support. It also awarded Phyllis permanent spousal support. William was ordered to pay Phyllis $37,000, one-half of the amount previously paid to her by ACE.

William contends the trial court abused its discretion in reclassifying the prejudgment payments as spousal support because there was no evidence of her need or his ability to pay during the interim period. He does not challenge the award of permanent spousal support but only the award of pendente lite spousal support.

■ An award of permanent spousal support made pursuant to Civil Code section 4801 requires the court to make specific factual findings. The same is not required for an award of pendente lite spousal support. The trial court has discretion to award spousal support pending a final judgment in the dissolution proceeding. (Civ. Code, § 4357.) The amount of support lies within the trial court's sole discretion based on the needs of the parties and their ability to pay. (Civ. Code, § 4801; *In re Marriage of Stich* (1985) 169 Cal.App.3d 64, 71 [214 Cal.Rptr. 919].)

■ The trial court did not abuse its discretion in awarding the interim support. There was ample evidence that during the time in question Phyllis had a significantly reduced income and the need for support and that William had the ability to pay.

Phyllis testified that in 1985 she received approximately $4,000 in interest on her savings, drew $19,090 in income from Thirst Quenchers (another family owned business given to her by stipulation), a bonus from ACE of

approximately $8,500, and $5,200 in equipment lease income. This totals $36,790 or $3,065.83 per month. She testified she had the same income in 1986. During those years she paid approximately $1,100 monthly in state and federal taxes which leaves a monthly adjusted gross income of $1,965.83. Phyllis also testified that the decrease in her income caused a marked change in her life-style. She had to be more conservative with spending, had to stop using a gardener, could not take vacations, stopped buying clothes and had to postpone most of the maintenance on the family home.

William testified that in 1984 he had a salary and bonus income of $157,000 from ACE and Phyllis had an income of $65,000. He only had salary and bonus income of $68,000 in 1985 because after the separation he voluntarily reduced his ACE salary to $35,000. However, at the same time he cut his salary, he caused ACE to significantly increase its contributions to his pension plan. The trial court could easily conclude William had the ability to pay interim support.

We reject William's argument that the trial court cannot award pendente lite support retroactively. William specifically stipulated that the amounts paid to Phyllis by ACE were subject to reclassification, essentially agreeing to just such an action by the court. The evidence amply supports the trial court's exercise of its discretion.

### III

William contends the trial court erred in ordering him to reimburse the community for amounts spent by ACE during the parties' separation which the court ruled were not proper business expenses. During the period of separation ACE paid for many of William's personal expenses including meals, vacations, a video cassette recorder, personal estate planning and accounting services, personal insurance premiums and other entertainment items. The trial court ordered William to pay Phyllis $27,494.50 which was one-half of the total amount which the court found ACE had improperly spent on these items.

William challenges the trial court's finding with respect to three specific expenditures. First, ACE purchased a 1984 Porsche automobile for William at a cost of $5,699. The company already provided him with a 1982 Porsche. ACE paid the insurance, maintenance, and principal and interest payments on the new car. While it owned the 1984 Porsche, ACE was unable to resell the 1982 Porsche. The court found the acquisition of the 1984 Porsche cost ACE a total of $7,499. Secondly, ACE made a charitable contribution of $8,500 to William's alma mater. Finally, ACE hired William's girlfriend and

paid her $22,500 as a marketing director, although she had no experience in marketing, to develop new markets for an airless tire inner tube. She was on the company payroll at a time when William asserted ACE was experiencing cash flow problems causing him to reduce his salary from $100,000 to $35,000. Her college degree was in home economics and she had worked for 22 years as a high school counselor. She proposed creating a campus student sales force to sell the inner tube. Her efforts produced virtually no sales. The court found that a manager would not have hired and paid for such an employee in a "non-amorous relationship."

■ A spouse who has the management and control of a business which is community property has a duty to act in good faith towards the other spouse in the management and control of the business. (Civ. Code, § 5125, subd. (e).) The standard of care imposed is the same duty owed by persons having relationships of personal confidence specified in Civil Code section 5103. The trial court found William was guilty of wasting community assets by his actions in managing ACE and of violating the standard of care owed to Phyllis. William argues the purchase of the car, the charitable contribution and the hiring of his girlfriend were all for legitimate corporate purposes although, in retrospect, they were not good choices from a business standpoint.

■ Reimbursement of the community is allowed when the managing spouse abuses his right of management and control. (*In re Marriage of Smaltz* (1978) 82 Cal.App.3d 568, 571 [147 Cal.Rptr. 154].) The trial court found William abused his management right by using ACE for personal expenditures. There is substantial evidence in the record to support its finding. The charitable contribution to William's alma mater was a gift of community personal property without Phyllis's consent. The court could also conclude that payment of a salary to William's girlfriend was an improper use of community assets. Finally, the court could conclude that ACE's purchase of the 1984 Porsche when William already had a company car was an improper expense.

IV

William contends the trial court erred in awarding Phyllis $88,000 in attorneys' fees. In his income and expense declaration filed in December 1988, William stated he had spent $136,384 in attorneys' fees. $82,466 of that had been paid by ACE and $53,918 by William personally. Phyllis indicated she had incurred $105,932 in attorneys' fees and she had personally paid $28,233.

■ The trial court has broad discretion to award attorneys' fees and costs in a dissolution action. The court's decision will not be disturbed on appeal

absent a clear showing of abuse of discretion. (Civ. Code, § 4370; *In re Marriage of Bergman* (1985) 168 Cal.App.3d 742, 763 [214 Cal.Rptr. 661].) In making an award, the trial court must determine what is just and reasonable under the circumstances, taking into consideration the parties' needs and ability to pay and the conduct of each party. (Civ. Code, §§ 4370.5, 4370.6.)

█ William's income and expense declaration states that ACE, a community asset, had paid a substantial portion of his attorneys' fees. It is apparent the trial court payment simply equalized that by having William pay a like amount of Phyllis's fees. We cannot say the court abused its discretion.[3]

### DISPOSITION

The judgment is reversed with respect to the valuation of ACE. In all other respects the judgment is affirmed. The matter is remanded to the trial court for further proceedings in accordance with the opinion. Phyllis is entitled to her costs of appeal.

Crosby, Acting P. J., and Moore, J., concurred.

---

[3]William argues that ACE did not really pay $82,466 of his attorneys' fees. He states this number was placed on his income and expense declaration by mistake. At the hearing he suggested ACE had paid approximately $32,000 of his attorneys' fees. This is simply a question of the evidence. There is evidence to support the trial court's action in awarding the fees.