[No. F038685. Fifth Dist. Aug. 26, 2002.]

In re the Marriage of BEARL EDWARD and CAROLE MURRAY.
BEARL EDWARD MURRAY, Appellant, v.
CAROLE MURRAY, Respondent.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part I.C. and II.B.

**COUNSEL**

Steven R. Grecco and Dawn E. Wardlaw for Appellant.

No appearance for Respondent.

**OPINION**

**BUCKLEY, Acting P. J.**—Bearl Edward Murray appeals from an order in this dissolution action deciding reserved issues of spousal support, the division of community property, and attorney fees and costs. We will affirm.

The case began in 1991, when Bearl petitioned for a divorce from his estranged wife, Carole, who was then living in Texas.[1] On Carole's request, the court ordered Bearl to pay her $800 per month in temporary spousal support. The order was based in large part on the court's finding Bearl had been evasive and untruthful in disclosing his income and assets.

The court also ordered the Murrays, pursuant to a stipulation between them, to sell their house in Southern California. The house was sold later that year for $170,000. The Murrays' net recovery from the sale, approximately $82,000, was immediately attached by one of Bearl's creditors to help pay off business and personal debts.

Bearl asked the court in 1992 to modify the support order on the ground both his health and his business had since failed, and he was deeply in debt.

---

[1] We refer to the parties by their given names for the sake of clarity only; we intend no disrespect. (*In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 280, fn. 1 [111 Cal.Rptr.2d 755]; *In re Marriage of Rossi* (2001) 90 Cal.App.4th 34, 36, fn. 1 [108 Cal.Rptr.2d 270].)

On June 25, 1992, the court (Judge Oberholzer) "suspended" Bearl's support obligation but reserved the right to reinstate it retroactively.

Bearl filed a voluntary chapter 7 bankruptcy petition two months later in August. The petition was eventually dismissed, based once again on a finding, made this time by the bankruptcy court, that Bearl had attempted to defraud his creditors by concealing his assets.

In 1997, evidently after the bankruptcy had been dismissed, Bearl petitioned the court to bifurcate support and property issues and grant the dissolution as to marital status only. A judgment of dissolution was entered accordingly on July 16, 1997. The court reserved jurisdiction over all other issues.

In 1999, Carole requested a determination by the court on the reserved issues of spousal support, the division of marital assets, and attorney fees and costs. Following a two-day trial in March of that year, the court ruled in Carole's favor on all three of the issues. Bearl appeals from the orders regarding the first two.

The court found Bearl had, in fact, been able to pay spousal support during the entire seven-year period from July 1, 1992 (the month after his support obligation was suspended) through June 30, 1999 (the month in which, the court found, Bearl became disabled). Therefore, the court retroactively reinstated Bearl's support obligation and ordered him to pay Carole $64,000 in arrearages.[2]

In the course of dividing the community property, the court found that Bearl had "obviously committed a fraud upon [Carole]" in regard to the disposition of the proceeds from the sale of their home in 1991. Accordingly, the court awarded the entire amount, $82,000, to Carole. When combined with the court's other findings, the net effect of the property division was to require Bearl to make an equalizing payment to Carole in the amount of $28,902.91.

A judgment to this effect was entered on June 1, 2001, and notice of entry was filed three days later. Bearl filed a timely notice of appeal on July 27.

Bearl challenges the court's support order on four related grounds. He contends: (1) the court's 1992 order suspending support amounted to a res

---

[2]In fact, although the "suspension" hearing was held on June 25, 1992, the court's support order was not entered until October 13, 1992. Therefore, the suspension did not take effect until November 1, 1992. Arrearages were calculated accordingly for 80 months at $800 per month.

judicata determination he lacked the ability to pay at that time; (2) there has been no showing of any subsequent "changed circumstances" sufficient to justify a modification of support; (3) there is no evidence Bearl had the ability to pay the retroactive support; and (4) the court may not, in effect, compel someone over the age of 65 to go to work to pay support.

Bearl challenges the property division order on two grounds. He contends: (1) there is no clear and convincing evidence Bearl committed a fraud; and (2) there is no evidence connecting the fraud, if there were one, to the sale of the house.

In order to consider these claims in their proper context, we must first set out in greater detail the evidence of Bearl's financial circumstances. The following is our best attempt to reconstruct them from the sketchy record.

## FACTUAL AND PROCEDURAL BACKGROUND

When Bearl and Carole married in 1972, Bearl was working for a company called Baker Hughes, which apparently was involved in the oil business. The record provides little more information about his work there except that the couple's community assets would later be found to include a Baker Hughes pension plan that paid Bearl $179 per month, and about $8,000 in a Baker Hughes Thrift Plan.

Bearl suffered an industrial injury in 1973 that left him, by his account, totally disabled. He survived for the next several years on Social Security disability payments. (Carole was also working during that period as a cosmetologist.) Finally, in 1981 or so, Bearl went back to work as a commissioned salesperson for a company called Fishing Masters, which, notwithstanding its name, was an oil field supply company. He would eventually become the company's "working manager."

Fishing Masters was owned by Bill and Sam Malisos. In 1987, they asked their aunt, Genevieve Malisos, to come to work for the company. She did, and soon struck up a friendship with Bearl.

### The House in Texas

In 1989, when both Bearl and Carole were in their late 50's, they decided to retire and move to Texas. They were living together then in a house they owned in Garden Grove, California. Carole went to Texas in January and arranged to buy a house in Fort Worth. The Murrays paid $20,000 down for

the house and financed the balance.[3] Carole finally left California and moved into the house in May or June of 1989. She took some or all of the household furniture with her, depending upon whose testimony can be believed. Bearl remained behind in California.

### M & E Sales and Service

Also in 1989, sometime after Carole moved to Texas, Fishing Masters went into bankruptcy. Bill and Sam Malisos offered to sell Bearl the company's production tools so he could start his own similar business. Bearl accepted the Malisoses' offer, and signed a $500,000 note for the equipment, but lacked the additional funds necessary to operate the business. So he turned to Genevieve Malisos. Over the next two years, beginning in September of 1989, she made some 20 business loans to Bearl, each evidenced by a promissory note, totalling approximately $287,000, plus interest. She also made several other loans to him during this period, totalling about $70,000, for his personal expenses (including the down payment on the Texas house). And, as we explain below, she supported him after the business failed.

Bearl renamed the business M & E Sales and Service, and relocated it to Hawaiian Gardens, in Southern California. He was sole owner of the company, notwithstanding Genevieve Malisos's sizeable investment in it.[4] In fact, she continued to work there but never got paid. Her job included paying all the bills, both for the business and for Bearl personally (he had given her a power of attorney). Carole on the other hand, although she was living in Texas, received a "paycheck" from M & E every two weeks for an amount usually between $400 and $500, less payroll deductions. However, by her account, Carole was unaware of Bearl's interest in M & E until after he bought the company, she knew nothing of the Malisos loans, and she never gave Bearl her consent to borrow money from Malisos or from any of his many other creditors.

This arrangement, with Bearl in California and Carole in Texas, lasted for about two years before Bearl's mounting debts finally forced him to close

---

[3]There is some dispute about the details of the deal to buy the Fort Worth house. Carole testified it cost $87,000 in 1989 but subsequently lost its value and was worth only about $52,000 by the time of trial in 2000. She also testified the $20,000 down payment came from her savings and "my son's funeral." Bearl testified the house cost $56,000, it was worth $100,000 at the time of trial, and he had borrowed the down payment from Genevieve Malisos. Malisos agreed with Bearl's account. The court eventually found the house was community property, with a value of $78,000, and awarded it entirely to Carole.

[4]There also is some dispute about whether Genevieve Malisos was a partner in M & E Sales and Service, or not. Bearl testified he made her an equal partner. But Malisos testified she had no ownership interest in the business, she guaranteed none of the other loans Bearl received, and she was never sued by the business's creditors.

M & E Sales and Service sometime late in 1991. Several other significant things also happened around this same time.

## The Dissolution Petition

Most importantly, Bearl decided he did not want to join Carole in Texas, and so filed a dissolution petition in Kern County on June 11, 1991.[5] Carole filed a response and a request for spousal support, in which she stated Bearl had stopped sending her money (i.e., the M & E Sales and Service "paychecks") the previous April. Bearl opposed the request for support, citing his physical disability, the collapse of his business, and the size of his debt. He claimed his income was then limited to a pension of $831 per month (presumably from Baker Hughes), along with the prospect of receiving about $750 per month in Social Security disability payments (which presumably had been discontinued when he went to work for Fishing Masters in 1981).

## Temporary Spousal Support

Following a hearing in September of 1991, the court (Judge Wiseman) directed Bearl to pay Carole $800 per month in spousal support. In its written ruling issued in October, the court gave the following explanation:

"3. Although [Bearl] may have suffered health problems in the past (approximately 1973 to 1979), there is insufficient evidence to substantiate a finding that he is totally disabled. . . .

"4. [Bearl] has not been truthful in disclosing his assets. First, this court is dissatisfied with the presentation of out-of-date financial information regarding M and E Sales and Services, Inc. . . . [¶] In addition, [Bearl] was extremely evasive in answering questions about the financial status of M and E. . . .

"5. [Bearl's exhibit] K [a financial statement apparently submitted in support of a loan application] shows [he] had a net worth of close to one million dollars. [Bearl] explains this by stating that even though he signed

---

[5]It is not at all clear why Bearl filed the petition in Kern County. The Murrays' home was in Garden Grove (Orange County) and the business address for M & E Sales and Service was in Hawaiian Gardens. Indeed, Bearl had filed another dissolution petition a few weeks earlier in Orange County. Moreover, at some point within this time period, although just when is another subject of controversy, Bearl and Genevieve moved into a rented apartment in Buena Park. Bearl testified this was in about 1990 or 1991, but Genevieve testified it was not until 1993. The date became important insofar as it was necessary to determine if they were living together when Genevieve sued Bearl (late in February of 1992) to recover the money she had loaned him. Notwithstanding his other testimony, Bearl claimed they were not. But we are getting ahead of ourselves.

the statement as being true and correct, he knew it was inaccurate and padded substantially. . . .

"6. [Bearl] seems to find money for the things that he wishes to do including the purchase of vehicles and for trips to Hawaii. . . ."

The formal support order was filed on March 18, 1992.

### Sale of the House in California

Bearl also complained in his opposition to Carole's support petition that he was having to make monthly mortgage payments on their house in Garden Grove, which was unoccupied at that point, because Carole refused to sign the necessary documents to sell it. He and Carole stipulated at the September hearing to an order directing the sale. The order was entered on November 18, 1991. The Murrays received an offer soon afterward for $170,000, and the court issued another order in December directing them to accept it.

The Murrays realized something over $82,000 from the sale of the house: about $26,000 was held in escrow, and another $56,000 or so was deposited in the trust account of Bearl's lawyer at the time, Edward Thomas. However, Carole never received any part of this money, for reasons the court would later conclude amounted to fraud on Bearl's part.

### Attachment of the Sale Proceeds

On February 28, 1992, about two months after sale of the house, Genevieve filed suit against Bearl and M & E Sales and Service to recover the monies she had loaned them, both business and personal, which by then totalled about $350,000 including accrued interest. Bearl was served with the complaint in April. He did not contest the action, and a default judgment for this amount was therefore entered against him in May.

On the strength of this judgment, Genevieve immediately attached the proceeds of the house sale, both the $26,000 in the escrow account and the $56,000 in Thomas's trust account. Bearl and Genevieve both testified that he (Bearl) had not told her (Genevieve) about the existence of the trust account. According to Genevieve, she learned of it from a private investigator she hired named Rick, who had since died.[6]

Further, Genevieve testified, she then spent all of this money to pay off some of M & E Sales and Service's creditors. She did this, she explained,

---

[6]Genevieve testified the investigator had also found a $70,000 credit union account belonging to Bearl, but the money had "disappeared" before she was able to lay claim to it.

even though she had no ownership interest in the company and had not personally guaranteed payment of its debts, because some of the creditors had threatened to sue her as a corporate officer (executive secretary).

### "Suspension" of Temporary Spousal Support

On June 4, 1992, Bearl petitioned the court to modify his support obligation on the premise his deteriorating health and financial situations were "changed circumstances" sufficient to justify a reduction of the obligation to zero. He claimed that with the collapse of his business and loss of the proceeds from the sale of his house, he was forced to live "from disability check to disability check." He explained that, since the September support hearing, his Baker Hughes pension had been reduced from $832 to $174 per month because "during our marriage, I opted for early retirement." On the other hand he had begun receiving $1,042 per month in Social Security disability benefits.

Bearl also requested an order directing Carole to cooperate with him in obtaining an appraisal of the house in Texas.

So far as appears from the record, Carole filed no response to Bearl's petition. She did, however, appear through her attorney at a hearing on the petition on June 25, 1992. The minutes from the hearing state the court's ruling as follows: "Obligation to make spousal support payments suspended, the Court reserves the right to make any award of spousal support retroactive." It seems this order contemplated some further action by the court, on the issue of support or appraisal of the Texas house, because the minute order also noted the matter was being continued until August 10. These proceedings, however, seem to have been suspended by Bearl's bankruptcy, which he filed on August 12, 1992. (But see 11 U.S.C. § 362(b)(2)(A)(ii) [bankruptcy does not stay proceedings to modify or collect support].)

The court's (Judge Oberholzer's) formal order following the hearing was entered on October 13, 1992. It stated: "Until trial or further order of this court, neither [Bearl] nor [Carole] shall pay any support or maintenance to the other. However, this court retains the right at that time to make any support order retroactive to the hearing date on the order to show cause."

### Bearl's Bankruptcy

Bearl filed a petition for chapter 7 bankruptcy protection on August 12, 1992. The record provides very little information about the proceedings beyond that, except the petition was eventually dismissed because, as Bearl

put it, "he [the bankruptcy judge] felt that I had assets put away somewhere that I hadn't declared [but] I didn't have." The court evidently found that Bearl had concealed his ownership of the equipment he acquired from Fishing Masters.

It appears the bankruptcy proceedings lasted for several years, and the dissolution proceedings were suspended during that time.

### Dissolution as to Marital Status

Bearl filed a petition on June 16, 1997, requesting the proceedings be bifurcated and a dissolution granted as to marital status only. The court granted the petition, and a judgment of dissolution was entered on July 18. The court reserved jurisdiction over all other matters.

### The Present Proceedings

Sometime in 1999, Carol petitioned the court for a determination of the remaining issues in the dissolution. She requested, in particular, an award of spousal support back to the date it was suspended in 1992. She based this request on her contention Bearl had materially misrepresented to the court the facts upon which the suspension was based. She also requested that the court, in dividing community assets, allocate to her the entire proceeds from the sale of the house in California on the ground Bearl had conspired with Genevieve Malisos to misappropriate the money. And she requested Bearl be ordered to pay her $10,000 for her attorney fees and costs.

The court held a hearing on the petition over a period of two days in March of 2000. Bearl, Carole, and Genevieve were called to testify, and assorted pleadings and documents were submitted to the court.

According to Carole's income and expense declaration, along with her testimony at the hearing, she had worked part time in Texas for about two years after moving there in 1989, but had since developed several serious health problems that forced her to stop: she had suffered strokes in 1998 and 1999, she had been an insulin-dependent diabetic for the past eight years, and she was scheduled to undergo a radical mastectomy for breast cancer. Her income was limited to Social Security payments of $505 per month, and welfare payments of $266 per month. She estimated her monthly expenses were about $1,200.

Bearl, according to his testimony and pleadings, had recently worked for about "a year or so" doing refrigeration work for the Red Cross, where he

was making nearly $3,400 per month until he reinjured his back in June of 1999. Apart from a one-time payment of $3,600 in workers' compensation, his only income since then had been his Baker Hughes pension of $179 per month. He claimed expenses of just over $3,000 per month. In addition, he reported he recently had paid his attorney $5,114.

Asked to explain how he could manage to live on so little income, Bearl testified his sister and others had loaned him money, and he had recently borrowed $7,000 against his life insurance policy. Mostly, however, Genevieve had been supporting him, partially or completely, at least since the time they began living together. Genevieve confirmed this was indeed their arrangement.

At the conclusion of the hearing, the court stated its ruling with regard to spousal support as follows: "Dealing with issues of support, I will find that during the period of time until he was again injured in June of 1999, per Mr. Murray's testimony, albeit, Ms. Malisos says it was like August of 1999, I am going to find that Mr. Murray did have the wherewithal to pay spousal support. And Judge Oberholzer, when he terminated spousal support, left the option, upon later hearing, of making an order retroactive to the date he terminated spousal support. And I will find [Bearl] did have the ability to pay spousal support from the date of that order of Judge Oberholzer until the end of June, 1999. And I will order that he pay Ms. Murray spousal support at the rate of $800.00 per month for that period of time." The effect of this order, as we have said, was to hold Bearl responsible to Carole for $64,000 in support arrearages.

As for allocation of the proceeds from the sale of the Murrays' home in California, the court said: "I find that Mr. Murray and Ms. Malisos obviously committed a fraud upon Mrs. Murray in the disposition of the assets from the Orange County property. I find that to be true for the following reasons: That I was given no backup at all for the promissory notes that were used to prove up the debt in the Orange County Superior Court; it is obvious to me that the parties are cohabitating and have been for many years; it is obvious to me that what Ms. Malisos said she did with the proceeds that she seized from the escrow and from Mr. Thomas' trust account makes no sense at all and is inconsistent with her claim that this was a legitimate debt that was owed to her by Mr. Murray. So I award all of those proceeds of 80 some thousand dollars to Mrs. Murray, Carole Murray, without offset." This order, when combined with the court's other findings with regard to the division of community property, effectively required Bearl to make an equalizing payment to Carole in the amount of $28,902.91.

A judgment to this effect was entered on June 5, 2001.

DISCUSSION[7]

## I. *Spousal Support*

As we have said, Bearl objects to the court's support order on four grounds: (1) the 1992 order suspending his support obligation amounted to a res judicata determination he lacked the ability to pay at that time; (2) there has been no showing of any "changed circumstances" since then sufficient to justify a modification of support; (3) there is no evidence Bearl had the ability to pay support during the period of retroactivity; and (4) the court may not, as this order arguably would, compel someone over the age of 65 to go to work to meet a support obligation.

The first three of these objections, in essence, challenge the court's 1992 support order insofar as it reserved the right of the court in the future to modify Bearl's obligation back to the date of the original order.[8] That is, this retroactivity condition, if it could be given effect, meant the 1992 order was merely a provisional one and so did not amount to a final res judicata determination that Bearl lacked the ability to pay support. Moreover, it permitted the court to modify the order upon a showing, not that Bearl's circumstances had since changed, but that his circumstances were not as he had represented them to be at the time the order was made. Indeed, this was the basis for Carole's request in 1999 to modify support retroactively: "3. **Spousal Support.** Respondent [Carole] requests that this court order reasonable spousal support retroactive to June 25, 1992, the date of Judge Oberholzer's order predicated upon the substantial misrepresentation of material facts by Petitioner [Bearl] to Judge Oberholzer . . . ."

In short, Bearl's objections are valid only if the retroactivity condition was not. We find no support for the proposition a court may provisionally reduce or "suspend" spousal support, subject to retroactively reinstating the full

---

[7]Carole has not filed a respondent's brief.

[8]This, at least, is how the parties and the court at the 2000 support proceedings interpreted the 1992 order. The order itself is somewhat ambiguous. The minutes of the June 25, 1992, hearing state: "Obligation to make spousal support payments suspended, the Court reserves the right to make any award of spousal support retroactive." The formal order, entered on October 13, 1992, provides: "Until trial or further order of this court, neither [Bearl] nor [Carole] shall pay any support or maintenance to the other. However, *this court retains the right at that time to make any support order retroactive to the hearing date on the order to show cause* [(OSC)]." (Italics added.) It is not clear to *which* OSC the 1992 order was referring. If it was referring to a future OSC giving rise to a hearing at which support would be reinstated, the retroactivity condition was entirely superfluous.

"An order modifying or terminating a support order may be made retroactive to the date of the filing of the notice of motion or order to show cause to modify or terminate, or to any subsequent date . . . ." (Fam. Code, § 3653 (all further statutory citations refer to this code unless noted otherwise).)

amount if it subsequently determines the facts upon which the reduction was based were inaccurate or incomplete. Therefore, we will conclude the court acted in excess of its jurisdiction when it imposed the retroactivity condition as part of its 1992 order. However, we will also conclude Bearl may not now collaterally attack the condition.

The court is authorized to award temporary (pendente lite) spousal support by section 3600, which, at all times pertinent to this appeal, provided in part: "During the pendency of any proceeding for dissolution of marriage . . . , the court may order (1) the husband or wife to pay any amount that is necessary for the support of the wife or husband . . . , as the case may be." (Cf. § 4330 [authorizing court to award permanent spousal support in "a judgment of dissolution of marriage"].)

## A. *Retroactivity*

■ "Awards of temporary spousal support do not serve the same purposes, nor are they governed by the same procedures, as awards for permanent spousal support." (*In re Marriage of Dick* (1993) 15 Cal.App.4th 144, 166 [18 Cal.Rptr.2d 743].)[9] "Temporary spousal support is utilized to maintain the living conditions and standards of the parties in as close to the status quo position as possible pending trial and the division of their assets and obligations." (*In re Marriage of Burlini* (1983) 143 Cal.App.3d 65, 68 [191 Cal.Rptr. 541].) On the other hand, "[t]he purpose of permanent spousal support is not to preserve the preseparation status quo but to provide financial assistance, if appropriate, as determined by the financial circumstances of the parties after their dissolution and the division of their community property." (*Id.* at p. 69; *In re Marriage of Schulze* (1997) 60 Cal.App.4th 519, 525 [70 Cal.Rptr.2d 488]; *In re Marriage of Winter* (1992) 7 Cal.App.4th 1926, 1932 [10 Cal.Rptr.2d 225].)

Awards of temporary spousal support rest within the broad discretion of the trial court and may be ordered in "any amount" (§ 3600) subject only to the moving party's needs and the other party's ability to pay. (*In re Marriage of Dick, supra,* 15 Cal.App.4th at p. 159.) Permanent support, by contrast, is constrained by numerous statutory factors set out in section 4320. (*In re Marriage of Cheriton, supra,* 92 Cal.App.4th 269, 312; *In re Marriage of Czapar* (1991) 232 Cal.App.3d 1308, 1316 [285 Cal.Rptr. 479]; Hogoboom

[9]Many of the cases we cite below were decided under the former provisions of the Civil Code, which were the same as or similar to the current provisions of the Family Code that replaced them effective January 1, 1994. (Stats. 1992, ch. 162, p. 464 et seq.)

& King, Cal. Practice Guide: Family Law (The Rutter Group 2002) ¶ 5:156, p. 5-62.1; ¶ 6-828, p. 6-300.2.)[10]

■ An order awarding temporary spousal support "may be modified or terminated at any time except as to an amount that accrued before the date of the filing of the notice of motion or order to show cause to modify or terminate." (§ 3603, former Civ. Code, § 4357.) Thus, the statute makes no provision for "suspending" a spousal support order, or for modifying it retroactively beyond the date the underlying request for modification was filed. To the contrary, "[a]n order modifying or terminating a support order may be made retroactive to the date of the filing of the notice of motion or order to show cause to modify or terminate, or to any subsequent date . . . ." (§ 3653, former Civ. Code, § 4801.) The filing date, in other words, establishes the outermost limit of retroactivity.

And, most significantly here, an order for temporary spousal support is in the nature of a final judgment and so is directly appealable. (*In re Marriage of Skelley* (1976) 18 Cal.3d 365 [134 Cal.Rptr. 197, 556 P.2d 297].)

"An order for support is operative from the moment of pronouncement. And a final judgment excluding future support does not preclude recovery of all money due under a prior temporary support order. [Citations.] In addition, the retroactive effect of any modification or revocation of support is limited to the date of filing the notice of motion or order to show cause, or any date subsequent thereto. (Civ. Code, § 4801 [now Fam. Code, § 3653].)" (*In re Marriage of Skelley, supra,* 18 Cal.3d at p. 369.) "An order granting or denying temporary alimony is not merely a procedural ruling made during the course of the action that the court may reconsider at any time before final judgment [citations], but is directly appealable as a final judgment independently of the main action. [Citation.]" (*Greene v. Superior Court* (1961) 55 Cal.2d 403, 405 [10 Cal.Rptr. 817, 359 P.2d 249].)

It follows that a court may not retroactively modify a prior order for temporary spousal support. In *In re Marriage of Garcia* (1990) 224 Cal.App.3d 885 [274 Cal.Rptr. 194], for example, the court granted wife

[10]Section 3600 was amended in 2001 to add the following italicized language: "During the pendency of any proceeding for dissolution of marriage . . . , the court may order (*a*) the husband or wife to pay any amount that is necessary for the support of the wife or husband, *consistent with the requirements of Sections 4320 and 4325* . . . , as the case may be." According to one commentator, the change was intended only to require the court, in awarding temporary spousal support, to consider any history of domestic violence between the parties, not to require it to conduct the same sort of section 4320 analysis as is required in awarding permanent support. (Hogoboom & King, Cal. Practice Guide: Family Law, *supra,* ¶ 5:150a, pp. 5-59 to 5-60.)

use of the family home between the time the couple separated and the time the home was sold, and ordered husband to make the mortgage payments in lieu of spousal support. However, the court later ordered wife to reimburse the community for the home's rental value during the period of her exclusive occupancy. She challenged this order on the ground it amounted to a retroactive modification of husband's spousal support obligation. The appellate court agreed and reversed the order.

"The trial court's authority to consider 'all the circumstances' in determining whether to order compensation [for a spouse's exclusive use of a community asset] does not include the authority to award reimbursement if it concludes that a prior temporary support order was too generous. Civil Code section 4357 [(now Fam. Code, § 3603)] provides that a temporary support order 'may be modified or revoked at any time *except as to any amount that may have accrued prior to the date of filing of the notice of motion or order to show cause to modify or revoke.*' (Italics added.) This statute has been construed to prohibit retroactive modifications of temporary support. [Citation.] Had the trial court awarded husband compensation for wife's use of the family residence on the ground that the prior orders had been too generous, its action would be invalid as a retroactive modification of those prior orders." (*In re Marriage of Garcia, supra,* 224 Cal.App.3d at pp. 895-896, fn. omitted.)

The case cited in *Garcia* for this last proposition is *In re Marriage of Van Sickle* (1977) 68 Cal.App.3d 728 [137 Cal.Rptr. 568]. In *Van Sickle,* wife appealed from an interlocutory judgment of dissolution that, among other things, ordered her to reimburse husband, from her share of the community property, for all the payments he had made to her under prior orders for temporary spousal support. Husband had not filed a "notice of motion or order to show cause to modify or revoke" any of these prior support orders (former Civ. Code, § 4357, now Fam. Code, § 3603); rather the court had ordered the reimbursement on its own to equalize the division of community property. That is, there was no earlier modification request to which the reimbursement order related. Therefore, the court concluded the order "was in effect an impermissible attempt to modify the preexisting temporary spousal support orders retroactively. [Citations.]" (*Van Sickle,* at p. 740; compare with *In re Marriage of Johnson* (1983) 143 Cal.App.3d 57, 63-64 [191 Cal.Rptr. 545] [directing trial court to reconsider earlier order for temporary spousal support where wife *had* made several subsequent motions for modification on ground husband had failed to fully disclose his income and assets].)

Likewise, in *Keck v. Keck* (1933) 219 Cal. 316 [26 P.2d 300], the court reversed an order that offset husband's obligation for accrued temporary

support payments, due under a *prior order*, against wife's indebtedness to him. "It is settled that a decree for alimony may be modified as to installments to become due in the future. As to accrued installments it is final." (*Id.* at p. 320. Accord, *In re Marriage of Ludwig* (1976) 58 Cal.App.3d 744, 749-750 [130 Cal.Rptr. 234]; *Vick v. Superior Court* (1965) 239 Cal.App.2d 105, 108 [47 Cal.Rptr. 840]; but see *Gay v. Gay* (1905) 146 Cal. 237, 242-243 [79 P. 885]; *Larsen v. Larsen* (1951) 101 Cal.App.2d 862, 865 [226 P.2d 650] [an award of temporary spousal support may include a lump-sum payment for past living expenses when necessary to enable supported spouse to further prosecute case and support him- or herself on the amount of support to be paid in the future].) ■ The court in *Keck* went on to note: "It is by virtue of the finality of alimony decrees as to past due installments that the Supreme Court of the United States has held that an alimony decree of one state is within the full faith and credit clause, and must be recognized in the courts of another state." (*Keck, supra,* 219 Cal. at p. 321, referring to *Sistare v. Sistare* (1910) 218 U.S. 1 [30 S.Ct. 682, 54 L.Ed. 905].)[11]

We find one additional case noteworthy but distinguishable. In *In re Marriage of Czapar, supra,* 232 Cal.App.3d 1308, the parties, at the time of their separation in 1983, owned a business called ACE. Husband was the manager, and wife was an employee of the business. In 1984, husband fired wife from her job, whereupon she filed an order to show cause for spousal support. In response, the parties stipulated ACE would pay wife $2,000 a month. These payments were characterized in the stipulation as a distribution of community property, but were made " 'subject to being re-classified at the time of trial—in the trial judges [*sic*] discretion . . . .' " (*Id.* at p. 1316.) In the judgment of dissolution entered in 1989, the trial judge reclassified the payments as spousal support. Husband challenged the reclassification on appeal, claiming it was an abuse of discretion for lack of evidence of his ability to pay in the interim, or wife's need. The court, however, found ample evidence of both. It then concluded: "We reject [husband's] argument that the trial court cannot award pendente lite support retroactively. [Husband] specifically stipulated that the amounts paid to

---

[11]It would seem to follow from the finality of a temporary support order that a subsequent modification should require a showing of "changed circumstances," as in the case of a permanent support order. (See, e.g., *In re Marriage of Lautsbaugh* (1999) 72 Cal.App.4th 1131, 1133 [85 Cal.Rptr.2d 688]; *In re Marriage of McCann* (1996) 41 Cal.App.4th 978, 982-983 [48 Cal.Rptr.2d 864]; *In re Marriage of Biderman* (1992) 5 Cal.App.4th 409, 412-413 [6 Cal.Rptr.2d 791].) We are aware, however, that there are several cases that hold no such showing is necessary. (See, e.g., *Sande v. Sande* (1969) 276 Cal.App.2d 324, 329 [80 Cal.Rptr. 826]; *Zinke v. Zinke* (1963) 212 Cal.App.2d 379, 382-384 [28 Cal.Rptr. 7]; *Rosenthal v. Rosenthal* (1961) 197 Cal.App.2d 289, 306-307, 309-311 [17 Cal.Rptr. 186].) We do not attempt to resolve this issue, for reasons that will appear.

[wife] by ACE were subject to reclassification, essentially agreeing to just such an action by the court. The evidence amply supports the trial court's exercise of its discretion." (*Id.* at p. 1317.)

But for the first sentence of the court's statement, it does not appear this *was* the subject of husband's argument: the legality of a retroactive modification as opposed to the sufficiency of the evidence to support the modification. In any case, to the extent it was the issue, we understand the court's conclusion to be limited to the facts of that case, i.e., where the parties had expressly stipulated to a reclassification. We do not believe it supports the more general proposition a court may retroactively modify support to a date *before* "the filing of the notice of motion or order to show cause to modify or terminate" a preexisting order. (§ 3653.)[12]

█ Finally we note that the law provides a remedy, other than the one the court tried to use in this case, when one spouse has misrepresented his or her income or assets in a proceeding to determine support or the division of property. Section 2122 permits the court to set aside a support order obtained through fraud or perjury, provided the motion to set aside is brought within one year from the date the complaining party discovered or should have discovered the fraud or perjury.

For these reasons, we conclude the court acted in excess of its jurisdiction when it imposed the retroactivity condition as part of the 1992 support order.

## B. *Acts in Excess of Jurisdiction*

█ A court acts in excess of jurisdiction "where, though the court has jurisdiction over the subject matter and the parties in the fundamental sense, it has no 'jurisdiction' (or power) to act except in a particular manner, or to give certain kinds of relief, or to act without the occurrence of certain procedural prerequisites." (*Abelleira v. District Court of Appeal* (1941) 17 Cal.2d 280, 288 [109 P.2d 942, 132 A.L.R. 715].) "Speaking generally, any acts which exceed the defined power of a court in any instance, whether that power be defined by constitutional provision, express statutory declaration,

---

[12]Section 3653 was amended effective January 1, 1998, to add a new subdivision (c), which prohibited a supporting spouse from recovering an overpayment when "an order decreasing or terminating a support order is entered retroactively pursuant to this section . . . ." (Stats. 1998, ch. 854, § 1.) Subdivision (c) was amended a year later to say just the opposite, i.e., it now permits the court to order the repayment of excess support following a retroactive reduction or termination. (Stats. 1999, ch. 653, § 4, eff. Jan. 1, 2000; see *In re Marriage of Petropoulos* (2001) 91 Cal.App.4th 161, 170 [110 Cal.Rptr.2d 111].) However, the repayment is still subject to section 3653, subdivision (a), which limits retroactivity to the date the request to modify or terminate was filed. (*Petropoulos*, at pp. 174-175.)

or rules developed by the courts and followed under the doctrine of *stare decisis*, are in excess of jurisdiction . . . ." (*Id.* at p. 291; see also 2 Witkin, Cal. Procedure (4th ed. 1996) Jurisdiction, § 276, pp. 840-842.)

"Action 'in excess of jurisdiction' by a court that has jurisdiction in the 'fundamental sense' (i.e., jurisdiction over the subject matter and the parties) is not void, *but only voidable*. [Citations.] In contrast to cases involving other types of jurisdictional defects, a party may be precluded from challenging action in excess of a court's jurisdiction when the circumstances warrant applying principles of estoppel, disfavor of collateral attack or res judicata. [Citation.]" (*Conservatorship of O'Connor* (1996) 48 Cal.App.4th 1076, 1088 [56 Cal.Rptr.2d 386], fn. omitted.)

■ "It is the general rule that a final judgment or order is res judicata even though contrary to statute where the court has jurisdiction in the fundamental sense, i.e., of the subject matter and the parties." (*Pacific Mut. Life Ins. Co. v. McConnell* (1955) 44 Cal.2d 715, 725 [285 P.2d 636]; see also *Frank v. Frank* (1969) 275 Cal.App.2d 717, 721-723 [80 Cal.Rptr. 141].)

" 'If there is jurisdiction of the subject matter and the parties, one who complains of the act is usually before the court. He has an opportunity to object, or to have the judgment or order reviewed by the usual methods of direct attack, such as new trial or appeal. He may also in many situations use the extraordinary writs of prohibition, mandamus or certiorari to directly attack and prevent or annul the unauthorized act. In brief, there are adequate methods of direct attack on such judgments, and there is almost a presumption of negligence on the part of the aggrieved party who fails to seek these normal remedies and later raises the objection by collateral attack. [¶] If this analysis is sound, acts merely in excess of jurisdiction, by a court having jurisdiction of the subject matter and parties, should not be subject to collateral attack unless exceptional circumstances precluded an earlier and more appropriate attack.' [Citation.]" (*Law Offices of Stanley J. Bell v. Shine, Browne & Diamond* (1995) 36 Cal.App.4th 1011, 1024 [43 Cal.Rptr.2d 717], quoting what is now 2 Witkin, Cal. Procedure, *supra*, Jurisdiction, § 323, p. 899.)

"For example, a judgment may be collaterally attacked where unusual circumstances were present which prevented an earlier and more appropriate attack." (*Pacific Mut. Life Ins. Co. v. McConnell, supra*, 44 Cal.2d at p.727; see also 2 Witkin, Cal. Procedure, *supra*, Jurisdiction, § 329, pp. 911-913, and cases cited therein.)

This is not such a case. There is nothing in the record suggesting Bearl could not have challenged the retroactivity condition at the time the court

imposed it. Accordingly, we conclude the court's 1992 support order, including the retroactivity condition, is res judicata and therefore beyond the reach of this appeal.

This leaves us then to decide whether sufficient evidence exists to show Bearl had the ability to pay spousal support between July of 1992 and July of 1999. In the following, unpublished portion of this opinion, we will conclude that it does.

C.   *Sufficiency of the Evidence**

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

II.   *Property Division*

Bearl challenges the part of the court's property division order that awarded Carole all the proceeds, some $82,000, from the sale of their house in Garden Grove. The court based the order on its finding that "Mr. Murray and Ms. Malisos obviously committed a fraud upon Mrs. Murray in the disposition of the assets from the Orange County property."

The court made this finding and order pursuant to section 1101, and in particular subdivision (h), which penalizes a breach of fiduciary duty (see §§ 1100, 721)[15] by a spouse in a dissolution proceeding. Section 1101 (former Civ. Code, § 5125.1) provides in part:

"(a) A spouse has a claim against the other spouse for any breach of the fiduciary duty that results in impairment to the claimant spouse's present undivided one-half interest in the community estate, including, but not limited to, a single transaction or a pattern or series of transactions, which transaction or transactions have caused or will cause a detrimental impact to the claimant spouse's undivided one-half interest in the community estate. [¶] . . . [¶]

---

*See footnote, *ante*, page 581.

[15]Section 1100, subdivision (e) (former Civ. Code, § 5125, subd. (e)) states in part: "Each spouse shall act with respect to the other spouse in the management and control of the community assets and liabilities in accordance with the general rules governing fiduciary relationships which control the actions of persons having relationships of personal confidence as specified in section 721 . . . ."

Section 721 (former Civ. Code, § 5103) provides in part that, subject to certain exceptions, "in transactions between themselves, a husband and wife are subject to the general rules governing fiduciary relationships which control the actions of persons occupying confidential relations with each other. This confidential relationship imposes a duty of the highest good faith and fair dealing on each spouse, and neither shall take any unfair advantage of the other."

"(h) Remedies for the breach of the fiduciary duty by one spouse, as set forth in Sections 721 and 1100, *when the breach falls within the ambit of Section 3294 of the Civil Code* shall include, but not be limited to, an award to the other spouse of 100 percent, or an amount equal to 100 percent, of any asset undisclosed or transferred in breach of the fiduciary duty." (Italics added.)[16]

Civil Code section 3294, in turn, provides:

"(a) In an action for the breach of an obligation not arising from contract, *where it is proven by clear and convincing evidence* that the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant. [¶] . . . [¶]

"(c) As used in this section, the following definitions shall apply: [¶] . . . [¶]

"(3) 'Fraud' means an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury." (Italics added.)

### A. *Standard of Review*

█ Bearl maintains the evidence, measured by the "clear and convincing evidence" standard, is not sufficient to support the court's finding his actions amounted to fraud. As part of this contention, he asks us to apply a more rigorous definition of the standard than is contained in BAJI No. 2.62. (See *Mattco Forge, Inc. v. Arthur Young & Co.* (1997) 52 Cal.App.4th 820, 847-850 [60 Cal.Rptr.2d 780] [rejecting the same contention and approving BAJI No. 2.62].)[17] We do not address this second argument because, as we will explain, the burden of proof at the trial level does not affect the nature of our review.

---

[16]We note that the predecessor statutes to sections 721, 1100, and 1101 (Civ. Code, §§ 5103, 5125, and 5125.1, respectively) were amended effective January 1, 1992, to increase the standard of care between spouses from one of "good faith" to a fiduciary one. (*In re Marriage of Reuling* (1994) 23 Cal.App.4th 1428, 1437-1438 [28 Cal.Rptr.2d 726].) In *Reuling*, the court held the higher fiduciary standard does not apply to conduct that occurred before 1992. (*Id.* at p. 1439; see also Hogoboom & King, Cal. Practice Guide: Family Law, *supra*, ¶ 8:627, p. 8-156.13.)

The Murrays sold their Garden Grove house late in 1991, but Genevieve did not attach the proceeds until early in the following year.

[17]Essentially, Bearl argues that clear and convincing evidence, in the context of this case, is "evidence which is so clear as to leave no substantial doubt, and sufficiently strong to demand unhesitating assent of every reasonable mind."

Bearl would have this court review the record under a heightened standard of review. He bases his argument on *Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847 [93 Cal.Rptr.2d 364], where the court held the evidence did not support a jury verdict awarding punitive damages against an insurer under Civil Code section 3294. The court said of the standard of review: "In this appeal, the jury award of punitive damages must be upheld if it is supported by substantial evidence. [Citations.] As in other cases involving the issue of substantial evidence, we are bound to 'consider the evidence in the light most favorable to the prevailing party, giving him the benefit of every reasonable inference, and resolving conflicts in support of the judgment.' [Citation.] But since the jury's findings were subject to a heightened burden of proof, we must review the record in support of these findings in light of that burden. In other words, *we must inquire whether the record contains 'substantial evidence to support a determination by clear and convincing evidence . . . .'* [Citation.]" (78 Cal.App.4th at p. 891, italics in original omitted, italics shown above added; see also *In re Marriage of Rossi, supra,* 90 Cal.App.4th 34, 40, quoting the italicized language from *Shade Foods.*)

*Shade Foods*, in turn, relied on two cases for this last proposition: *Tomaselli v. Transamerica Ins. Co.* (1994) 25 Cal.App.4th 1269 [31 Cal.Rptr.2d 433] and *Stewart v. Truck Ins. Exchange* (1993) 17 Cal.App.4th 468 [21 Cal.Rptr.2d 338].) *Tomaselli*, like *Shade Foods*, involved the review of a jury verdict awarding punitive damages against an insurer. There the court, in describing the standard of review, said: "Finally, it is significant that the Legislature amended Civil Code section 3294 in 1987 to add the requirement that punitive damages be proved by 'clear and convincing evidence.' *While this change may not have altered the standard of our review (all we are required to find is substantial evidence to support a determination by clear and convincing evidence* [citation], it assuredly emphasized the greater and more convincing proof desired at the trial level." (*Tomaselli, supra,* 25 Cal.App.4th at p. 1287, italics added.)

The case cited by *Tomaselli* for the proposition set out in italics was *Patrick v. Maryland Casualty Co.* (1990) 217 Cal.App.3d 1566 [267 Cal.Rptr. 24]. It too involved the review of a jury verdict awarding punitive damages against an insurance company. There, in describing the standard of review on appeal, the court said: "We review the record for substantial evidence of circumstances warranting the imposition of punitive damages. We reject appellant's argument that a more stringent standard than the normal substantial evidence rule should apply due to the 1987 amendments to Civil Code section 3294, subdivision (a) which required that the trier of fact find 'clear and convincing evidence' of malice, fraud, or oppression.

[Citation.] Despite the difference in the standard for the determination of this issue by the trier of fact, it has been held that in such circumstances the substantial evidence test applied by the reviewing court is not altered. (*Crail v. Blakely* (1973) 8 Cal.3d 744, 750 [106 Cal.Rptr. 187, 505 P.2d 1027] ['That standard [of clear and convincing evidence] was adopted, however, for the edification and guidance of the trial court, and was not intended as a standard for appellate review. . . . "[I]f there is substantial evidence to support its conclusion, the determination is not open to review on appeal." [Citations.]']; accord *In re Marriage of Saslow* (1985) 40 Cal.3d 848, 863 [221 Cal.Rptr. 546, 710 P.2d 346].)" (*Patrick, supra,* 217 Cal.App.3d at p. 1576; see also 9 Witkin, Cal. Procedure (3d ed. 1997) Appeal, § 365, p. 415.)

In contrast, the issue before the court in *Stewart* was not a jury award of punitive damages, but a judgment of nonsuit. There the court, in reliance on cases (most notably *Anderson v. Liberty Lobby, Inc.* (1986) 477 U.S. 242 [106 S.Ct. 2505, 91 L.Ed.2d 202]) holding the clear and convincing standard of proof should be taken into account by the trial court in ruling on motions for summary judgment, concluded the same should be true with respect to motions for nonsuit.

"We see no reason why this standard should not apply here. If Stewart was ever going to prevail on his punitive damage claim he could only do so by the presentation of clear and convincing evidence that Truck had by its conduct, demonstrated malice. Thus, the trial court properly viewed the evidence presented by Stewart with that higher burden in mind. In our review of the trial court's order granting the nonsuit, we can do no differently." (*Stewart v. Truck Ins. Exchange, supra,* 17 Cal.App.4th at p. 482, fns. omitted; see also *Basich v. Allstate Ins. Co.* (2001) 87 Cal.App.4th 1112, 1118-1121 [105 Cal.Rptr.2d 153] [in action against insurer seeking punitive damages, i.e., where the plaintiff's ultimate burden rests on proof by clear and convincing evidence, this burden must be taken into account in ruling on defendant's summary judgment motion].)

But the considerations that apply to a trial court deciding whether to submit a case to the jury do not necessarily also apply to an appellate court reviewing the sufficiency of the evidence to support the jury's verdict. The reason is explained in *Anderson v. Liberty Lobby, Inc., supra,* 477 U.S. 242, in which the Supreme Court held a trial court must take account of the plaintiff's burden of proof in a libel action (clear and convincing evidence of actual malice) when ruling on the defendant's motion for summary judgment.

"[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden.

This conclusion is mandated by the nature of this determination. The question here is whether a jury could reasonably find *either* that the plaintiff proved his case by the quality and quantity of evidence required by the governing law *or* that he did not. Whether a jury could reasonably find for either party, however, cannot be defined except by the criteria governing what evidence would enable the jury to find for either the plaintiff or the defendant: It makes no sense to say that a jury could reasonably find for either party without some benchmark as to what standards govern its deliberations and within what boundaries its ultimate decision must fall, and these standards and boundaries are in fact provided by the applicable evidentiary standards." (*Anderson v. Liberty Lobby, Inc., supra,* 477 U.S. at pp. 254-255 [106 S.Ct. at p. 2513].)

In short, to the extent Bearl means to say we must find *more* substantial evidence to support the trial court's finding of fraud than we would if the burden of proof had been only a preponderance of the evidence, he is mistaken. Our review is the same regardless of the burden of proof at trial.

In the following unpublished portion of our opinion, we will conclude there is an abundance of evidence to support the court's finding of fraud. We will also reject Bearl's other objection to the court's property division order.

B.   *Sufficiency of the Evidence\**

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

DISPOSITION

The judgment is affirmed. Each party shall bear his or her costs.

Cornell, J., and Gomes, J., concurred.

---

\*See footnote, *ante,* page 581.