Filed 5/22/13  Conservatorship of C. D. CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| Conservatorship of the Person and Estate of C. D. | B242814<br><br>(Los Angeles County<br>Super. Ct. No. BP126875) |
| RICHARD D. as Conservators, et al.,<br><br>        Petitioners and Respondents,<br><br>    v.<br><br>C. D.,<br><br>        Objector and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Michael I. LeVanas, Judge.  Affirmed.

Linda J. Vogel, under appointment by the Court of Appeal, for Objector and Appellant.

No appearance for Petitioners and Respondents.

I.  INTRODUCTION

C. D. appeals from an order establishing a probate conservatorship over her person. C.D. argues there is insufficient evidence to support the conservatorship order appointing her brothers, Richard and Timothy[1] D., as probate conservators. We conclude substantial evidence supports the probate court's finding that C.D. is unable to provide properly for her personal needs for physical health, food, clothing or shelter. (Prob. Code § 1801, subd. (a).) We affirm the judgment.

## II. BACKGROUND

### A. Petition For Appointment of Conservators

On February 7, 2011, Richard filed petitions seeking appointment of himself as a temporary and permanent probate conservator of his sister, C.D. The petitions were also filed on behalf of Richard's brother, Timothy. The petitions allege C.D.: is 62 years old; suffers from schizophrenia; has been under a Lanterman-Petris-Short Act conservatorship in the past; did not currently have a conservator; lives in a long term unlocked residential psychiatric facility named MHA Village in Long Beach; refuses to take psychotropic medications; and her condition has worsened to the point she was "making bizarre and vaguely threatening statements to her family." The brothers sought temporary and general probate conservatorship in order to access C.D.'s medical records and communicate and receive psychiatric information from her health care providers. The brothers also wanted a conservatorship to: facilitate comprehensive psychiatric care and treatment; explore re-establishment of a Lanterman-Petris-Short Act conservatorship; and obtain a capacity declaration. In addition, the brothers wanted to be appointed

---

[1]     For clarity's purposes, we shall refer to the brothers by their first names.

conservators to apply for public benefits for C.D. Represented by appointed counsel, C.D. opposed the imposition of a conservatorship.

## B. C.D.'s Attorney's Report

On February 9, 2011 Violet Boskovich was appointed as C.D.'s counsel. The probate court authorized Ms. Boskovich to review and copy C.D.'s medical records. The probate court ordered the review and copying of the medical records without C.D.'s consent. On February 17, 2011, Ms. Boskovich filed a report concerning the temporary conservatorship. The report relates Ms. Boskovich interviewed: C.D.; the brothers; C.D.'s mother, Ilene D. (Ilene); Sandra Cosgrove-Provencal; C.D.'s caseworker at MHA Village; and Dr. Mark Ragins, a MHA Village psychiatrist. Ms. Boskovich reported C.D. was able but unwilling to attend the hearing and objected to the imposition of a conservatorship. Ms. Boskovich recommended the probate court waive C.D.'s appearance at the hearing. In addition, Ms. Boskovich recommended the appointment of an "Evidence Code section 730 Expert" to advise the probate court on C.D.'s best interests.

On February 25, 2011, C.D.'s brothers were appointed as temporary probate conservators of her person. The temporary probate conservatorship was established for the limited purpose of appointing Dr. Stephen Read, pursuant to Evidence Code section 730 to conduct a psychiatric examination. Dr. Read was also to prepare a report and complete a capacity declaration.

## C. Probate Investigator's Reports

On February 25, 2011, probate investigator Gailyn Spence interviewed C.D. at MHA Village. The interview occurred in the presence of C.D.'s social worker, Darlene Fernandez. Ms. Spence described the village as a day program for individuals with mental health issues. MHA Village provides C.D. with shelter under a grant for the

homeless. According to Ms. Spence, C.D. initially appeared anxious to speak. But the interview did not go in the direction C.D. wanted. Then, according to Ms. Spence, C.D. could not focus on the conservatorship and "exhibited bizarre" behavior. Ms. Spence reported: "She did advocate regarding a medical problem to her social worker. In the same breath, she states the feeling was coming from, 'James Brown was trying to kill Marvin Gaye.' The undersigned asked [C.D.] for her birth date. It took a while before she would divulge the information. She went into a discussion about her brothers and their alleged marital problems. C.D. would not focus on the issues regarding the proposed conservatorship and after a while, it became futile to engage her. She just would not focus, even with the assistance of Ms. Fernandez." C.D. denied she was in need a of a conservatorship and stated her brothers did not take care of her. C.D. did not want to attend court proceedings, stating, "I want to win without going to court."

Ms. Fernandez believed C.D. is stressed by the proposed conservatorship. C.D. does not respond appropriately under stress. Ms. Fernandez believed C.D. is able to advocate for her basic needs and has managed to hold onto her current housing as long as she is under the direction of MHA Village staff. C.D.'s abilities are questionable when she is not directed by the staff.

But Timothy stated C.D. has a college education and was a licensed vocational nurse. Timothy stated his sister is very smart but has a history of mental health issues and delusional behavior. Timothy said C.D. harassed their elderly mother, his wife and Richard's spouse. Timothy believed his sister's condition was getting worse because she made "veiled threats of the wives being killed" by an unspecified source. In addition, C.D. has refused to apply for public benefits, which would give her an income and allow her access to medical treatment. Timothy stated C.D.'s illness has taken her away from the family. He feared C.D. will end up on the streets if she becomes resistant to the rules at her current living facility. C.D. does not have any income and had a history of homelessness. The brothers sought the establishment of a conservatorship so they could gain access to C.D.'s medical information and apply for income and medical benefits for her.

4

Ms. Spence found, "[C.D.] is not able to discuss her medical issues in significant terms and appears to lack the capacity to give informed medical consent." Ms. Spence observed C.D. exhibited delusional behavior and was in denial, unable to focus on the issues. Because C.D. was resistant to medical treatment, her prognosis was uncertain and her stability compromised. Ms. Spence concluded, "[C.D.] has been resistant to act independently regarding entitlement benefits and demonstrates an inability to manage which places her at risk." Ms. Spence concluded C.D. was an appropriate candidate for a conservatorship. Ms. Spence recommended the brothers be granted conservatorship of C.D.'s person and estate.

On February 27, 2011, Ms. Spence conducted a follow-up investigation. Ms. Spence reported the MHA Village staff indicated C.D. was not prescribed any medications and is resistant to any psychotropic prescriptions. On March 7, 2011, Ms. Spence received a phone call from C.D.'s mother, Ilene. The mother was afraid for C.D.'s safety. This was because C.D.'s condition was getting worse. Ms. Spence reported: "[C.D.] is threatening [the mother] verbally and through the mail. [C.D.] is making [demands] that she wants the deed to her mother's house, the car, and $300,000.00 placed in her bank account. Ilene does not know what her daughter will do next. Also, [the mother] reports [C.D.] is threatening her brothers' wives. Her mother wants [C.D.] to get help because she is in denial regarding her illness. Her mother does not want her to get into trouble."

D. Dr. Read's Report

On June 13, 2011, Dr. Read's Evidence Code section 730 report was filed with the probate court. Dr. Read is a psychiatrist and clinical professor in the Department of Psychiatry and Biobehavioral Sciences, at the University of California at Los Angeles School of Medicine. Dr. Read reported he was unable to directly evaluate C.D. because she refused to meet him and evaded his efforts to interview her. As a result, Dr. Read's evaluation of her was based on: Ms. Spence's probate investigation reports;

5

correspondence with the brothers' counsel; a letter appointing Ilene as conservator for C.D. in April 1997; an April 23, 2010 letter to Ilene from C.D.; and interviews with C.D.'s appointed counsel and MHA Village staff members, Ms. Cosgrove-Provencal and Ms. Sandoval.

Dr. Read indicated he went twice to MHA Village in an attempt to interview C.D. Dr. Read stated C.D. lives near MHA Village in an apartment made available by funds from the homeless assistance program. These funds derive from donations to MHA Village. C.D. does not have any independent source of income. Although C.D. had worked in the past, she had not done so for at least 10 years if not longer. She has participated in the programs at MHA Village on a daily basis for about a decade. Before that, C.D. was homeless and destitute. According to Ms. Cosgrove-Provencal, C.D. has not demonstrated any behaviors or made any statements that have raised dangerousness concerns. MHA Village staff reported C.D. can manage her basic needs on a day-to-day basis through the support of its programs. But Ms. Cosgrove-Provencal and Ms. Sandoval said C.D. needed constant input and vigilance from staff to stay on track. C.D. had made no progress towards being able to manage on her own without help from MHA Village.

The MHA Village staff and others have encouraged C.D. to apply for Social Security Disability but she has consistently and adamantly refused to do so. C.D. stated she: was not disabled; did not have any mental illness; did not need money; and did not have schizophrenia. She has been seen on a regular but infrequent basis by Dr. Ragins. C.D. consistently refused to consider taking any kind of psychotropic medication.

Dr. Read wrote C.D. appeared grossly impaired by psychosis. Dr. Read indicated C.D. had written an April 23, 2010 letter to Ilene demanding $300,000. C.D.'s letter escalated her demands in the letter to, "$300 million a year and as much as I own." Dr. Read wrote: "I do not know whether she has any kind of hallucinations, but the communications in the letter of 4/23/10 and the description of her tangential and irrelevant comments in the interview with the probate investigator are best characterized as disordered thought. It is clear that these eruptions intrude on any ability to exchange

6

goal-oriented comments or discussion with C.D.  In addition, C.D. appears to be prone to making unsupportable assertions and refusing to examine them or tolerate any questioning.  Her refusal to follow advice of court-appointed counsel, despite pointed statements as to the importance of complying with the court order is one functional example of this delusional-based intentionality.  Another is C.D.'s refusal to appreciate at the Probate Investigator's interview the importance of appearing in court on her behalf.  A third example is the psychotically-phrased demand in the 4/23/10 letter to her mother."  Dr. Read diagnosed C.D. with schizophrenia based on the persistence of her thought disorder and her ability, when stress is carefully managed, to function superficially at simple tasks.  Dr. Read reported C.D. resisted any medications for her chronic schizophrenia but her brothers recalled when she was on medications, her mind had cleared and she functioned better.

Dr. Read concluded:  "[I]n my professional opinion, Ms. [C. D. ]appears chronically and unrelievedly to have severely impaired thought processes with prominence of delusional thinking.  Probably as a consequence of this primary deficit in mental function, C.D. also demonstrates severely impaired abilities due to severe anxiety, inability to concentrate and 'stay with' a particular problem, inability to appreciate and manage quantities and financially-valued judgments, impaired reasoning, and the severe inability to plan, organize, and carry out activities in her own self-interest.  As a consequence of these persistent deficits in multiple mental functions, in my professional opinion, Ms. [C. D.] cannot understand and appreciate or make and carry out decisions in her own self interest both as regards to her finances and her personal care."

Although there was no indication C.D. suffered a physical symptom or condition, she was approaching an age group in which it became more likely that illness would occur.  In addition, there was little to suggest C.D. could reliably appreciate the significance of some symptom that would arouse concern in a reasonable person.  Dr. Read wrote:  "In my professional opinion, the prominence of C.D.'s delusions and thought disorder raise the real possibility that Ms. [C.D.], the proposed conservatee, does in fact lack the capacity to give informed consent to any form of medical treatment

7

because she is unable to (1) reliably comprehend the risk and benefits of a proposed treatment, (2) respond knowingly and intelligently regarding medical treatment, (3) participate in a treatment decision by means of a rational thought process, or (4) to communicate reliably a decision she might make, i.e. that the deficits in Ms. [C.D.'s] mental functions described above significantly impair her ability to understand and appreciate and to communicate the consequences of medical decisions." Dr. Read urged caution in moving C.D. from her current living arrangement given the services and supported provided by MHA Village. Finally, Dr. Read indicated he was troubled by the threats C.D. made against the sisters-in-law and Ilene. But Dr. Read could not assess C.D.'s potential dangerousness without a full neuropsychiatric evaluation.

### E. Permanent Conservatorship Hearing

On February 10, 2012, the trial on the conservatorship was conducted. The conservators' counsel stated his clients tried numerous times to serve C.D. with the citation because she actively evaded service. Further, the conservators met C.D. at a Long Beach church to inform her of the trial and offered her transportation to and from court. They handed C.D. a copy of the citation and petition. C.D. replied: "I am not mentally ill. I am not going to court." She then threw the papers on the ground.

All counsel requested waiver of C.D.'s appearance. C.D.'s counsel reported: "She is aware of these proceedings. It's impossible for me to communicate with her." The probate court found C.D. knew about the hearing and refused to attend. The probate court waived further notice and citation to C.D. The probate court received Dr. Read's report into evidence. The probate court granted the conservators a conservatorship of C.D.'s estate and person. But the probate court reserved a decision on whether the conservators had the power to make medical decisions for C.D. pending filing of Dr. Read's supplemental report.

On March 23, 2012, the probate court held a hearing regarding C.D.'s medical capacity. Dr. Read's supplement report was received into evidence. Dr. Read

recommended the probate court grant medical decision-making powers to the conservators. Dr. Read concluded C.D. lacked the capacity to give informed consent and would benefit from medication for treatment of her severe psychiatric disorder. At the hearing, the probate court found C.D. lacked capacity to make informed medical decisions and granted that power to the conservators.

## III. DISCUSSION

C.D. challenges the probate conservatorship of her person. Probate Code section 1801, subdivision (a) provides, "A conservator of the person may be appointed for a person who is unable to provide properly for his or her personal needs for physical health, food, clothing, or shelter . . . ." Appointment of a conservator requires proof by clear and convincing evidence. (Prob. Code § 1801, subd. (e).) On appeal, we review the probate court's decision for substantial evidence. We consider all of the evidence in the light most favorable to the prevailing party and resolve conflicts in support of the conservatorship order. (*In re Marriage of Murray* (2002) 101 Cal.App.4th 581, 601-604; *Rubin v. Los Angeles Fed. Sav. & Loan Assn.* (1984) 159 Cal.App.3d 292, 298.)

C.D. argues there is insufficient evidence to support the appointment of a conservatorship of her person. C.D. contends the record is devoid of substantial evidence she was unable to provide properly for her physical health, food, clothing or shelter. C.D. asserts she has been able to maintain housing and meet her basic needs including medical needs with MHA staff support. We disagree.

Substantial evidence supports the probate court's decision to appoint the conservators. C.D. is a 63-year-old chronic schizophrenic who refuses to take any medication for her condition. C.D. threatened other family members and made irrational demands for money. Her brothers, the conservators, state that when she has been on medication in the past, her mind has cleared and she functioned better. Ms. Spence indicated that C.D. could not focus during their conversation. Rather, C.D. exhibited

9

bizarre behavior during their conversation. Ms. Spence concluded, "[C.D.] is not able to discuss her medical issues in significant terms and appears to lack the capacity to give informed medical consent." Dr. Read concluded C.D. did not in fact possess the capacity to provide informed consent for medical treatment. This was because she lacks the ability to engage in rational discussions and to intelligently understand the consequences of medical decisions. Moreover, Dr. Read noted that C.D. was approaching an age group in which illness was more likely to occur. According to Dr. Read, C.D.'s inability to knowledgeably evaluate medications contributes to her chronic psychosis. Thus, her diminished capacity presented a real threat to C.D.'s long-term safety. Further, C.D. was incapable of participating in the present proceedings in a rational manner. Ms. Spence and Ms. Boskovich notified C.D. of the conservatorship proceedings. C.D.'s brothers offered to provide transportation to and from the trial. But C.D. adamantly refused to make any court appearances. C.D. told Ms. Spence, "I want to win without going to court." In addition, C.D. refused to cooperate with Dr. Read. Dr. Read visited her twice in order to conduct a psychiatric examination. Additionally, according to Ms. Spence, C.D. could not focus on the conservatorship issues even with the help of a MHA Village staff member. Dr. Read's and Ms. Spence's reports constitute substantial evidence to support the order under review.

## IV. DISPOSITION

The conservatorship order is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

TURNER, P. J.

10

We concur:

ARMSTRONG, J.

KRIEGLER, J.